PRESBYTERY OF ELIJAH PARISH LO-
VEJOY by its representatives, the com-
mission members named below, and
Cortley Burroughs, Tracy Houston,
Manley Mace, William T. Hancock,
Richard D. Shewmaker and Lorna
Wagner, and Presbytery of Elijah Par-
ish Lovejoy, Inc., a Missouri pro forma
decree corporation, Plaintiffs-Respon-
dents,

v.

Paul JAEGGI, Paul Barker, Harold Bow-
erman, Robert Canfield, Ben Carter,
George Devlin, William Dick, Karl
Dolde, Jim Hydar, Terry Jones, George
Lanz, Robert Parks, Frank Rall, Dan
Smith, Darold Strand, Arthur Tapy,
and Memorial Presbyterian Church of
St. Louis, a Missouri pro forma decree
corporation, Defendants-Appellants.

No. 65853.

Supreme Court of Missouri,
En Banc.

Dec. 18, 1984.

Rehearing Denied Jan. 15, 1985.

Timothy Belz, Mark Belz, St. Louis, W. Jack Williamson, Greenville, Ala., for defendants-appellants.

Richard D. Shewmaker, John B. Shewmaker, Clayton, for plaintiffs-respondents.

GEORGE M. FLANIGAN, Special Judge.

The principal adversaries in this church property dispute are plaintiff Presbytery of Elijah Parish Lovejoy, a presbytery of the United Presbyterian Church in the United States of America, ("UPCUSA" or "the national church"), and defendant Memorial Presbyterian Church of St. Louis, a Missouri pro forma decree corporation, ("Memorial" or "the local church"). At issue are their respective rights to property which prior to this action was in the control of Memorial.

On July 21, 1980, at a duly called concurrent meeting of the congregation and corporation of Memorial, a resolution was adopted, by a vote of 153 to 0 with one abstention, to terminate "the voluntary association which has existed until now" between Memorial and the national church. Although some members of the congregation failed to vote, under church rules, local and national, "silent members, unless excused from voting, must be considered as acquiescing with the majority."

The individual plaintiffs are members of a commission, appointed on April 25, 1981, and acting under the authority of the national church. The commission would assume control of the property in the event the action succeeded. The individual defendants are "ruling elder members of the session" of Memorial.

The trial court, sitting without a jury, found the issues in favor of the plaintiffs and ordered the defendants to deliver to the commission "all assets, funds and property, both real and personal, now under the management and control of [Memorial]." The judgment also required the defendants to deliver to plaintiffs possession of the church building located at 201 Skinker Blvd., St. Louis, Missouri, and to account to the commission for all assets previously disposed of "for purposes other than purposes of [Memorial] as a particular church of [the national church]."

Defendants appealed to the Missouri Court of Appeals, Eastern District, which reversed the judgment. The cause was then transferred to this Court which now determines the same as on original appeal. Rule 83.09.[1]

The dispositive contention of Memorial is that the judgment should be reversed because (a) the trial court erred in holding that *Hayes v. Manning*, 263 Mo. 1, 172 S.W. 897 (1914), required deference to the decision of the national church with regard

---

1. All references to rules are to Missouri Rules of Court, V.A.M.R., and all references to statutes are to RSMo 1978, V.A.M.S.

to the control of the disputed property, (b) the trial court erred in holding that Missouri law forbids the use of "the neutral principles of law approach" enunciated in *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), for resolution of church property disputes, and (c) the latter approach, applied to the evidence, required a finding in favor of Memorial.

The trial court, in a memorandum accompanying its judgment, found that the form of organization of UPCUSA is hierarchical and that under Missouri law as expressed in *Hayes,* it, the trial court, was required to give deference to the decision of the highest tribunal within the national church. The trial court also indicated that if it were free to apply the neutral principles approach to the instant facts "it might reach a more equitable result ... this result would be to find in favor of [Memorial]."

■ This Court now adopts the "neutral principles of law" approach as the exclusive method for resolution of church property disputes. To the extent that *Hayes* is inconsistent with this holding, it should no longer be followed. Neither side claims that the neutral principles approach is inconsistent with any of the religious freedom provisions of the Constitution of Missouri, [art. I, § 5, § 6, and § 7], or with Missouri statutes [§ 352.010, et seq.] pertaining to religious associations. For the reasons which follow, this court finds that the record, viewed under the neutral principles approach, requires reversal of the trial court's judgment.

In its brief Memorial takes the position that UPCUSA "is not a hierarchical denomination, in which power flows from the top down, but is rather a connectional or representative denomination, in which power flows from the bottom up, through an ascending scale of judicatories." The brief of UPCUSA describes its government as "representative or republican." Some of the cases discussed below hold, as did the trial court, that UPCUSA is hierarchical. Since the neutral principles approach "accommodate[s] all forms of religious organization and polity," 443 U.S. at 603, 99 S.Ct. at

3025, this Court need not concern itself with any issue with regard to UPCUSA's form of organization.

*Jones* involved a dispute over the ownership of church property following a schism in a local church affiliated with hierarchical church organization. The "question for decision", said the Court, was "whether civil courts, consistent with the First and Fourteenth Amendments to the Constitution, may resolve the dispute on the basis of 'neutral principles of law,' or whether they must defer to the resolution of an authoritative tribunal of the hierarchical church." 443 U.S. at 597, 99 S.Ct. at 3022.

The court pointed out that "the State" has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively. The court stated:

> It is also clear, however, that 'The First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes.' ... Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice.... As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization.... Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, 'a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'

443 U.S. at 602, 99 S.Ct. at 3025.

The court then said that "at least in general outline," the "neutral principles of law" approach is consistent with the foregoing principles. *Id.* The neutral principals approach was approved in Maryland & Va. *Churches v. Sharpsburg Church,* 396

U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970), where a state court settled a local church property dispute on the basis of the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property. That approach, said the court in *Maryland & Va. Churches*, entailed "no inquiry into religious doctrine." 396 U.S. at 368, 90 S.Ct. at 500.

In *Jones* the Court held that a State is "constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." 443 U.S. at 604, 99 S.Ct. at 3026. The primary advantages of that approach, said the court, are "that it is completely secular in operation, and yet flexible enough to accommodate *all forms* of religious organization and polity." *Id.* at 603, 99 S.Ct. at 3025. (Emphasis added.) The court also said:

> The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.

*Id.*

Finally, the court held that a civil court, in *examining a religious document* pertinent to the dispute:

> must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust [in favor of the general church]. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.

*Id.* at 604, 99 S.Ct. at 3026.

The neutral principles approach, which the majority opinion in *Jones* discussed, permitted and at least tacitly advocated, is to be distinguished from what the majority termed the "rule of compulsory deference," *id.* at 605, 99 S.Ct. at 3026, or what the minority termed, the "rule of adherence," *id.* at 615, 99 S.Ct. at 3031. The primary source of the rule of deference is *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872), which was decided when the federal courts were still applying federal common law and before the religion clauses of the First Amendment were held applicable to the states. Although not a constitutional decision, the rule of deference set forth in *Watson* was said to be "founded in a broad and sound view of the relations of church and state under our system of laws." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). The minority opinion in *Jones* stated, "[T]he principles of general federal law announced in [*Watson*] are now regarded as rooted in the First Amendment and are applicable to the states through the Fourteenth Amendment." 443 U.S. at 617 n. 4, 99 S.Ct. at 3032 n. 4.

Under the "rule of deference," the use of which *Jones* still permits but no longer requires, the initial inquiry, in an intrachurch dispute over church property, was

"where within the religious association the rules of polity, accepted by its members before the schism, had placed ultimate authority over the use of church property." 443 U.S. at 618–19, 99 S.Ct. at 3033–34. (Powell, J., dissenting). If the church government was congregational, in which authority over questions of church doctrine, practice, and administration rests entirely with the local congregation, the civil courts, in disputes concerning the polity of a congregational church, enforce "the authoritative resolution of the controversy within the local church itself." *Id.* If the church government is hierarchical, the lower church being "an integral and subordinate part of a larger church," and "under the authority of the general church," the civil courts must give effect to the duly made decisions of the highest body within the hierarchy that has considered the dispute because the decisions of the local congregation are subject to review by the tribunals of the church hierarchy. *Id.*

In *Jones* the local congregation itself was divided, a situation which the majority addressed in a manner criticized by the dissenters. Even the dissenters, however, conceded, that the neutral principles rule suffices to settle disputes "between the central councils of a church organization and a unanimous local congregation." 443 U.S. at 614, 99 S.Ct. at 3031. The case at bar is of the latter variety.

Although both sides to the instant action produced witnesses and introduced many documents, there is no significant factual dispute. Over the years both Memorial and the national church underwent changes of name and mergers. Since both treat their respective predecessors as if they were on the same legal footing as the instant entities, this court will so consider them.

The national church has a written constitution consisting of the Book of Confessions and the Book of Order. The Book of Order includes the Form of Government. The Form of Government permits "a particular church," such as Memorial, to be organized only by the authority of "the Pres-

bytery." Each particular church has a "session" consisting of its pastor and "ruling elders," the latter elected by the congregation from among its active members. A presbytery, such as one of the instant plaintiffs, consists of the ministers and at least one ruling elder delegate from each particular church within the geographic bounds of the presbytery. The session of a particular church chooses the ruling elder delegate from that church to presbytery.

The bodies with governing authority in the national church are called "judicatories." In ascending order they are the session of the particular church, the presbytery, the synod, and the general assembly. A synod covers three or more presbyteries. The general assembly "is the highest judicatory [of the national church] and shall represent in one body all the particular churches thereof." Delegates to the synods and the general assembly are elected by the presbyteries.

Memorial was established in 1864. In 1866 Memorial withdrew from the national church and did not reaffiliate with it until 1877. During the separation Memorial retained all of the church property. In 1922 Memorial, by written indenture, transferred its assets to a "memorial fund" to be used for the acquisition of land on which a new church building would be erected. In 1937 the trustees of the "memorial fund" executed a "declaration of trust" in which the trustees recited certain actions they had taken under the 1922 indenture, including the acquisition of the land and the erection of the building.

The 1937 document recited that "in order that there be no question as to the trustees fully carrying out the terms and conditions of the trust indenture it is requested that this reiteration of the conditions under which the trust fund was turned over to [Memorial] be recorded in the minutes of [Memorial] and that by resolution the board of trustees [of Memorial] again accept and reaffirm the conditions as herein stated." The 1922 indenture which was incorporated into the 1937 declaration recited that the trustees, called the Memorial

Fund Committee, "shall have the power to receive and hold any and all kinds of property, real, personal or mixed, whether received as gifts, bequests, devises, contributions, donations or otherwise, all said properties to be held by it as principal and in trust for the purpose of maintaining and supporting out of the next income thereof, said [Memorial] or its successors, or any church with which it may consolidate."

In 1929 the General Council of the General Assembly of the national church proposed that its Constitution be amended to require that the charter or articles of incorporation of a local church declare "that its property is held in trust under the Constitution of and for [the national church]." This amendment was rejected.

In 1975 Memorial merged with Kingsland Presbyterian Church, a particular church affiliated with the national church. The articles of merger, adopted as the articles of incorporation of the merged association, recited that "the ecclesiastical affiliation" of the association "shall be with [UPCUSA]." The articles contained no provision expressly creating a property interest in favor of UPCUSA.

Prior to May 1980 one of the permanent committees of the national church, at a meeting "occasioned by the decision of the Supreme Court of the United States announced on July 2, 1979 in the case of *Jones v. Wolf*," recommended the adoption of an amendment to the Form of Government. The amendment recited, in part, that:

all property held by or for a particular church, a Presbytery, a Synod, the General Assembly, or [the national church] whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of the particular church or of a more inclusive judicatory or retained for the production of income is held in trust nevertheless for the use and benefit of [the national church].

The amendment further recited that "whenever property of, or held for, a particular church ... ceases to be used by that church, as a particular church of [the national church], in accordance with this constitution, such property shall be held, used, applied, transferred or sold as provided by the Presbytery." This amendment was adopted in May 1981.

On May 25, 1980, the congregation of Memorial unanimously adopted a resolution protesting the proposed amendment and transmitted it to the Presbytery and the General Assembly. On July 16, George Scotchmer, pastor of Memorial, notified the members of Memorial that a special "congregational and corporation meeting" would be held on July 21 to consider terminating Memorial's "voluntary association" with the national church. On July 21 the Memorial congregational incorporation unanimously adopted the resolution terminating Memorial's association with the national church. On July 30 Memorial notified the Presbytery of the July 21 proceedings. On September 10 the Presbytery notified Memorial that a commission would be appointed to "gather the facts" concerning Memorial's resolution and to make recommendations to the Presbytery. Correspondence ensued between Memorial and the national church in which Memorial stated that its decision to terminate the association was "clear and final".

On April 25, 1981, the commission, the individual plaintiffs, submitted a report to the Presbytery recommending that the Presbytery notify Memorial that it desired that Memorial "be not dissolved or destroyed," that Memorial's resolution of July 21, 1980, be declared null and void, that Memorial remain a particular church of the national church, and that Memorial be commanded by the Presbytery to "cease any attempts to give any effect to said purported termination and not to use any property ... for any purpose other than the use thereof for purposes of [Memorial] as a particular church of the [national church]." The report further recommended that litigation be brought against Memorial and that Memorial should be notified to show cause, at a meeting of the

Presbytery on June 20, 1981, why a commission should not be appointed to assume control of the Memorial property. The notice was given.

After disaffiliation Memorial continued to function as a church. It retained the services of its pastor, hired a second pastor, held regular worship services, administered the various trust funds, and in general engaged in the same activities which it pursued prior to disaffiliation. Memorial amended its articles to delete the reference to affiliation with the national church.

On June 20, 1981, the Presbytery held a meeting which Memorial did not attend. Purportedly acting under § 41.15 of the Book of Order, the Presbytery found that the session of Memorial "is unable or unwilling to manage wisely the affairs of its church in that it has participated in the attempt to terminate the relationship of [Memorial] with [UPCUSA]." The Presbytery vested the commission "with full power of a session ... which shall take the place of the existing session of [Memorial],

which shall cease to act until such time as the Presbytery shall otherwise direct...." This litigation ensued.

In the wake of *Jones*, property disputes have arisen in other states between a disaffiliating local church, such as Memorial, and the national church, UPCUSA, which is the largest of the Presbyterian denominations in the United States. Courts of last resort in Iowa and Maryland have found in favor of the national church, *Fonken v. Community Church of Kamrar*, 339 N.W.2d 810 (Iowa 1983); *Babcock Memorial v. Presbytery of Baltimore*, 296 Md. 573, 464 A.2d 1008 (1983), while those of New York and South Dakota have found in favor of the local church, *First Presbyterian v. United Presbyterian*, 62 N.Y.2d 110, 476 N.Y.S.2d 86, 464 N.E.2d 454 (1984); *Foss v. Dykstra*, 342 N.W.2d 220 (S.D. 1983).[2] Some of these cases dealt with specific sections of the Book of Order. These sections, and others relied upon by UPCUSA in the instant appeal, are set forth below.[3]

**2.** In *Beaver-Butler Presbytery v. Middlesex Pres. Ch.*, 80 Pa.Cmwlth. 211, 471 A.2d 1271 (1984), the Commonwealth Court of Pennsylvania found in favor of UPCUSA in a dispute concerning the right to control property of a local church which had voted, 125 to 31, to disaffiliate. The three-judge appellate court held that UPCUSA had a hierarchical form of government and that a Pennsylvania statute, enacted in 1935, required the court to "accept the Presbytery's decision [in favor of UPCUSA] as final and binding." The court pointed out that even under the neutral principles approach the statute would have to be considered and would be controlling. The Commonwealth Court, after opinion, granted a "petition for allowance of appeal." *Id.*

**3.** Section 34.01 of the Book of Order reads: "A particular church consists of a number of professing Christians, with their children, voluntarily associated together for divine worship and godly living, agreeably to the Holy Scriptures, and submitting to a certain form of government."

Section 34.02 provides that a particular church can be organized only by the authority of a presbytery.

Section 35.01 reads: "The radical (i.e. fundamental and basic) principles of Presbyterian Church government and discipline are: That the several different congregations of believers, taken collectively, constitute one Church of Christ,

called emphatically the Church; that a larger part of the Church, or a representation of it, should govern a smaller, or determine matters of controversy which arise therein; that, in like manner, a representation of the whole should govern and determine in regard to every part, and to all the parts united; that is, that a majority shall govern; and consequently that appeals may be carried from lower to higher judicatories, till they be finally decided by the collected wisdom and united voice of the whole Church. For these principles and this procedure, the example of the apostles and the practice of the primitive Church are considered as authority."

Section 41.07 gives the session of a particular church "exclusive authority over the use to which the church buildings and properties may be put."

Section 41.08 gives the session "authority over all of the affairs and activities of the particular church, except such matters as may, by this Form of Government, be specifically accorded to the pastor, to the congregation, or to a higher judicatory."

Section 41.15 reads: "Whenever, after a thorough investigation, and after full opportunity to be heard has been accorded to the session in question, the presbytery of jurisdiction shall determine that the session of a particular church is unable or unwilling to manage wisely the affairs of its church, the presbytery may appoint a commission composed of ministers and ruling

In *Fonken*, a 6 to 3 decision, the Iowa court affirmed the finding of the trial court that title to the local church property was subject to an implied trust in favor of the national church. The local congregation, by a vote of 192 to 96, had voted to dissolve affiliation with UPCUSA. The majority opinion reviewed the evidence under both the rule of deference and the neutral principles approach.

Under the rule of deference the majority held that the decision of the highest authority of a hierarchical church was conclusive upon the civil courts with respect to church property disputes and that UPCUSA is "plainly" a hierarchical organization. The court said that the local church's "right" to leave UPCUSA did not include the "right to take church property with them". The articles of incorporation of the local church stated that the latter's purpose was "to operate and maintain a Presbyterian church, affiliated with [UPCUSA]." The court held that the local congregation could not defeat property rights of UPCUSA, if they existed, by merely voting to disaffiliate and restating the local church's articles of incorporation.

Utilizing the neutral principles approach, the majority opinion made the assumption that title to the property was in the local church and held that the decisive issue was whether the Book of Order established an implied trust in favor of UPCUSA. The court held that the provisions of the Book of Order, construed together, gave UPCUSA "exclusive ultimate control of the use and disposition of local church property" and that "an implied trust exists as a result of UPCUSA's polity giving it determinative authority over the property of its subordinate churches."

The dissenters in *Fonken* agreed that UPCUSA would prevail under the rule of deference. The dissenters felt, however, that the dispute should be resolved under the neutral principles approach and that application of the latter would uphold the local church. The dissenters said that the only provision in the Book of Order which "remotely approaches language of trust" is § 62.11 which UPCUSA had conceded did not apply to the dispute under scrutiny.

In *Babcock* the local church, by a vote of 228 to 6, voted to withdraw from the national church and the session of the local church made, by deed, "an absolute and irrevocable gift" of real estate to a new corporation which was "an unaffiliated Presbyterian church." The by-laws of the local church recognized its affiliation with UPCUSA and recited that the by-laws were subordinate to the Constitution of UPCUSA. The Maryland court pointed out that under § 62.12 of the Book of Order a local church could not sell or mortgage its real estate without written permission of the Presbytery. The court held that if the local church could not sell property without the Presbytery's permission, it could not give it away. At p. 1017 the court said: *"More importantly,* however, applying neutral principles of law, the church corpo-

elders, with the full power of a session. This commission shall take the place of the existing session, if any, which shall cease to act until such time as the presbytery shall otherwise direct."

Section 42.08 gives the presbytery power to dissolve churches.

Section 62.04 requires a local church to incorporate, if local law permits, "to receive, hold, encumber, manage, and transfer property, and to facilitate the management of its civil affairs in such manner as may be directed by the session of the particular church from time to time and according to this Constitution."

Section 62.11 reads: "Whenever hereafter a particular church is formally dissolves by the presbytery, or has become extinct by reason of the dispersal of its members, the abandonment of its work, or other cause, such property as it may have, both real and personal, shall be held, used, and applied for such uses, purposes, and trusts as the presbytery may direct, limit, and appoint, or such property may be sold or disposed of as the presbytery may direct, in conformity with the Constitution of the United Presbyterian Church in the United States of America."

Section 62.12 forbids a particular church to do any of the following acts without the written permission of the presbytery: (a) sell, mortgage, or otherwise encumber any of its real property; (b) acquire real property subject to an encumbrance or condition; (c) lease its real property used for purposes of worship; and (d) lease for more than five years any of its other real property.

ration lacked power under *Maryland corporation law* to make the gift." (Emphasis added).

In *First Presbyterian* the New York Court of Appeals held that although UP-CUSA is a hierarchical organization, the local church, upon disaffiliation by a congregation vote of 334 to 4, was entitled to a resolution of the property dispute through application of the neutral principles approach.

Title to the land was held by the local church under deeds which did not include "language of trust or restriction vesting a present or future interest in the Albany Presbytery or the UPCUSA." The charter of the local church was "silent on the question of how the property is to be owned," and there was nothing in the New York Religious Corporations Law which affected the issue.

The court then considered the Book of Order. In examining it, said the court, it must "look only to provisions relating to property and it must interpret them in a secular light." The court found no provision in the Book of Order which created an express trust in favor of UPCUSA. The court discussed several sections of the Book of Order, including §§ 41.07, 41.08, 41.15, and 62.11, and found that none of them contained language sufficient to show an intention to establish an implied trust in favor of the national church. The court found "nothing in the Book of Order to support [the national church's] position."

In *Foss* the South Dakota court, using the neutral principles approach, found in favor of the local church. The court discussed §§ 41.07, 41.15, 62.11 and 62.12 of the Book of Order and held that they do not contain language creating a trust, express or implied, in favor of the national church. Referring to those four sections the court said, at pp. 224–25: "Although these provisions may limit a local church's use of the property while it is a member of the denomination, the language does not go far enough to constitute trust or reversionary terms such as the Supreme Court was seeking in [*Jones v. Wolf*]."

The court also stated that UPCUSA's adoption of the express trust amendment in 1981, after the local church had disaffiliated, "provides additional support to our conclusion that the Book of Order as it existed on [the date of disaffiliation] did not contain provisions creating a trust of local property."

▆▆▆ In applying the neutral principles approach to the instant record, this court in conformity with *Jones* must refrain from resolving the dispute on the basis of "religious doctrine and practice" and must rely "exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges." Documents, including religious documents, pertinent to the dispute, must be scrutinized in purely secular terms. This court must not "rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust" in favor of the national church. If the deed, local church charter, or national church constitution "incorporates religious concepts in the provisions relating to the ownership of property" and if the interpretation of those instruments would require the resolution of a religious controversy, then this court "must defer to the resolution of the doctrinal issues by the authoritative ecclesiastical body."

No provision in Memorial's charter or by-laws is relied upon by the national church to establish its property interest. The deeds to the involved land name Memorial as grantee and make no mention of the national church. With one exception, various trust funds, including those established for building purposes, make no mention of the national church. One fund did mention the national church but not as a beneficiary.

The national church does not claim that any Missouri statute serves to create a trust in its favor with respect to the property in dispute. Control of the property has always been exercised by Memorial without interference by the national church. The national church contributed nothing to the

acquisition of any of the disputed property. From time to time Memorial borrowed money and secured the loans with deeds of trust on the real estate. The national church was not mentioned in the documents effectuating those transactions.

In 1936 the local church was given $580 by the national church and the indenture reflecting that gift recited that if the local church ceased to be connected with the national church the amount of the grant was to be repaid with interest. The national church was given a security interest only in the land, defeasible upon repayment of the debt. This interest was inconsistent with a claim of right to control all property upon disaffiliation.

■ In order for the national church to prevail under the neutral principles approach on the instant record it must do so on the basis of the Book of Order. It will be recalled that in 1929 there was an unsuccessful attempt to amend the Book of Order so as to require a local church to provide in its articles of incorporation that its property was held in trust for the national church. It was not until May 1981, after Memorial's disaffiliation, that such an amendment was adopted.

■ None of the sections of the Book of Order set forth in footnote 3 contains any language expressly creating a trust in church property in favor of the national church.

Although § 35.01 sets forth, in general terms, that a larger part of the church should determine matters of controversy "which arise therein," and mentions the carrying of appeals to "higher judicatories," it makes no specific reference to a property dispute between the national church and a local church which has disaffiliated. The action taken by the Presbytery on June 20, 1981, after disaffiliation, was purportedly based on § 41.15 which contains no language, even when construed with §§ 41.07 and 41.08, sufficient to show the existence of a trust in favor of the national church with respect to the property of Memorial or a revisionary interest therein.

The Presbytery made no effort to invoke § 42.08 with regard to dissolution of the local church and indeed disclaims such intent. Thus the dissolution provisions of § 62.11 do not come into play. Other situations are contemplated by § 62.11 but they are not present here. Memorial has not become "extinct by reason of the dispersal of its members," nor has Memorial abandoned it, that is Memorial's work. Although disaffiliated, Memorial carries on the same religious activities which it practiced prior to the separation.

Although § 62.12 gives the Presbytery supervisory authority over specified real estate transactions of a particular church, that section, too, is silent with regard to any reversionary or trust interest of the national church with respect to the property of a local church which has disaffiliated.

This court agrees with the holdings in *First Presbyterian* and *Foss* that the Book of Order, as it existed on July 21, 1980, did not create an express or implied trust in favor of UPCUSA with respect to the property of Memorial.

The judgment is reversed.

RENDLEN, C.J., and WELLIVER, HIGGINS, GUNN, BILLINGS and BLACKMAR, JJ., concur.

DONNELLY, J., not sitting.