**CHURCH OF GOD IN CHRIST, INC., Appellant,**

v.

**Willie GRAHAM; Faith Mission Church of God in Christ, Inc., a Missouri Corporation, Appellees.**

**No. 94–2803.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 9, 1995.

Decided May 15, 1995.

**524**

Ronald C. Spradley, Kansas City, MO, argued (Douglas D. Silvius, on the brief), for appellant.

1. The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

Douglas L. Carter, Kansas City, MO, argued (David A.E. Barnes, on the brief), for appellee.

Before BOWMAN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

WOLLMAN, Circuit Judge.

The Church of God in Christ, Inc. ("Church") appeals from the district court's[1] grant of judgment for Willie Graham and the Faith Mission Church of God in Christ, Inc. ("Faith Mission") on the Church's claims seeking control over Faith Mission's property and pulpit. We affirm.

## I.

The Church is a large religious organization headquartered in Memphis, Tennessee. The Church's charter provides that local affiliates shall title their property in trust for the Memphis organization. Jurisdictional bishops are responsible for ensuring local compliance with the Church's doctrinal and other policies and are empowered to appoint and remove pastors for the local churches within their jurisdiction. Bishop E. Harris Moore is the jurisdictional bishop responsible for the western district of Missouri, which embraces Faith Mission.

Faith Mission was founded in Kansas City, Missouri, in the 1960s and became a nonprofit religious corporation in June 1971 under the leadership of its founding pastor, Hubert Lambert. Lambert was a credentialed Church minister and paid the annual assessments necessary to retain those credentials. Faith Mission contributed money to the Church, as well as to other organizations, in response to requests to support certain organized activities, and some of the Faith Mission members occasionally held administrative positions with the Church.

Despite the spiritual relation between the two institutions, Lambert never acknowledged that Faith Mission was subject to any regulatory oversight by the Church. Addi-

tionally, whenever Faith Mission purchased property, it took title in its own name. Faith Mission's articles of incorporation also explicitly declare its independence, stating in part that "it is expressly understood that this corporation is not bound by or subject to oversight by any other ecclesiastical body." Similarly, Faith Mission's by-laws state that "the corporation is not under the authority or jurisdiction of any bishop or any other person affiliated with the Church of God in Christ."

Faith Mission elected Graham pastor in March 1991, following Lambert's death. Several months later Moore installed Graham in that position in accord with Church practice. In 1992, as a result of the controversy over Faith Mission's relationship to the Church, Moore issued a directive revoking Graham's credentials and purporting to remove him from the pulpit. In March 1993, the Church filed suit, seeking injunctive relief requiring Graham to vacate the pulpit, a declaration of the Church's interest in Faith Mission property, and reformation of Faith Mission documents so that the property would properly reflect the Church's interest in accord with the Church's constitution and charter. Following a three-day bench trial, the district court found that Faith Mission was independent of the Church and that it should retain its property free of any claims of the Church.

## II.

■ As an initial matter, Faith Mission challenges this court's jurisdiction because Moore testified at trial that the Church was interested in the souls of the congregation rather than in Faith Mission's property. Inasmuch as this dispute relates to the contested property rights, however, the Church properly alleged a legitimate dispute in its complaint. The Church has consistently asserted its desire to settle the property issues as well as to have the courts grant its prayer for specific performance of its ecclesiastical decrees. The involvement of ecclesiastical authorities does not deny us jurisdiction to resolve the underlying property issues. Additionally, the nature of the churches' relationship must be decided to determine if we

may exercise jurisdiction over any of the other matters raised by the parties.

■ The parties agree that Missouri law governs resolution of their property dispute. They disagree as to the district court's application of Missouri law and the proper constraints placed on that law by the First Amendment. We review the district court's application of Missouri law de novo, *see Ruwitch v. William Penn Life Assur. Co. of America*, 966 F.2d 1234, 1236 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 331, 121 L.Ed.2d 249 (1992), but defer to its factual determinations unless they are clearly erroneous. This clear error standard also applies to the district court's interpretation of the parties' documentary evidence. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *Taylor v. Turner*, 884 F.2d 1088, 1090 (8th Cir.1989).

The Church asserts that the district court ignored the Church's ecclesiastical decree relating to a purely non-secular relationship between itself and Faith Mission. According to the Church, its decree governs the property issue and failure to defer to that disposition would alter its polity, thereby violating the First Amendment and contravening the mandate of *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724–25, 96 S.Ct. 2372, 2387–88, 49 L.Ed.2d 151 (1976). This argument, however, ignores the state's interest in resolving the underlying property issues. "The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775 (1979).

■ Although neither the courts of Missouri nor this court can resolve property disputes "on the basis of religious doctrine and practice," *id.; see Milivojevich*, 426 U.S. at 724–25, 96 S.Ct. at 2387–88, the property issues may be settled by applying "neutral principles of law." *Jones*, 443 U.S. at 602, 99 S.Ct. at 3025. Application of "objective, well-established concepts of trust and property law" in religious property disputes does not

run afoul of the First Amendment because it "entail[s] 'no inquiry into religious doctrine.'" *Id.* at 603, 99 S.Ct. at 3025 (quoting *Maryland & Va. Eldership of the Churches of God v. The Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 368, 90 S.Ct. 499, 500, 24 L.Ed.2d 582 (1970)). Accordingly, the states are not required to defer to an ecclesiastical determination of property ownership where no "doctrinal controversy is involved." *Id.* at 605, 99 S.Ct. at 3026.

■ Missouri has adopted the neutral principles approach as its exclusive means of resolving religious property disputes. *Presbytery of Elijah Parish Lovejoy v. Jaeggi,* 682 S.W.2d 465, 467 (Mo. banc 1984), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 262 (1985). Missouri courts look to a number of neutral factors for guidance, including the language of the local church's charter and by-laws. *Id.* at 473; *Boatmen's First Nat'l Bank v. Southern Mo. Dist. Council of the Assemblies of God,* 806 S.W.2d 706, 712 (Mo.App.1991); *Reorganized Church of Jesus Christ of Latter Day Saints v. Thomas,* 758 S.W.2d 726, 729–31 (Mo.App. 1988). Also to be considered under Missouri law are relevant state statutes, deeds, and other evidence relating to who controls and contributed to the acquisition of the contested property. *Elijah Parish,* 682 S.W.2d at 473–74; *see Thomas,* 758 S.W.2d at 730–31 (viewing surrounding circumstances to resolve latent ambiguity in deeds).

■ We agree with the Church that its charter and constitution must also be considered to properly assess the claim under recognized neutral principles of Missouri law. *See Elijah Parish,* 682 S.W.2d at 473–74. Although such evidence is probative—and makes this a closer case than *Elijah Parish* itself—it is not dispositive. Here, much as in *Elijah Parish,* the national Church does not claim that any state statutes create a trust in its favor. Additionally, the national organization contributed nothing to the acquisition of the property, and the local congregation exercised complete control over the property without any interference from the Church. Particularly damaging to the Church's claims are Faith Mission's articles of incorporation, which explicitly declare its independence, and

the language of the deeds vesting title and control over the property in the hands of the local congregation. *See Jones,* 443 U.S. at 603 n. 3, 99 S.Ct. at 3025 n. 3 (recognizing that express terms of property instruments must be enforced); *Boatmen's First Nat'l Bank,* 806 S.W.2d at 714–15 (summary judgment on the basis of local church by-laws is appropriate only if their meaning is apparent); *see also Milivojevich,* 426 U.S. at 723, 96 S.Ct. at 2387 (diocesan constitutional provisions were "not so express" as to require enforcement). The Church does not argue that these instruments are themselves ambiguous, merely that the district court disregarded the Church constitution in interpreting them. Further, the district court specifically found that there was "no reason for Faith Mission members to believe their property was held in trust for [the Church]." Any reliance of the Church on its charter and constitution is severely diluted by this finding. The Church did not automatically provide local pastors with a copy of its manual, nor was it distributed generally to Faith Mission's members. To require the Faith Mission congregation to hold its property in trust for another without proper notice as to that requirement would too severely distort the application of neutral principles of Missouri law. With only its charter and constitution to point to, no evidence that Faith Mission actually acquiesced in that constitution, and all the other considerations pointing in favor of Faith Mission, we conclude that the national Church cannot wrest ownership from the Faith Mission congregation under neutral principles of Missouri law.

■ The Church, however, urges us to adopt the approach of *Kendysh v. Holy Spirit Byelorussian Autocephalic Orthodox Church,* 683 F.Supp. 1501, 1509–10 (E.D.Mich.1987), *aff'd,* 850 F.2d 692 (6th Cir.), *cert. denied,* 488 U.S. 994, 109 S.Ct. 558, 102 L.Ed.2d 584 (1988). In applying Michigan law, the *Kendysh* court looked to the hierarchical and interactional relationship between the two religious entities to resolve the underlying property dispute. *See id.* at 1510 (viewing the "living relationship" between the two entities). Missouri could conceivably look to the relationship between the

two churches for assistance in determining whether to defer to an ecclesiastical declaration of property rights, as does Michigan. *See, e.g., Calvary Presbyterian v. Presbytery of Lake Huron of the United Presbyterian Church,* 148 Mich.App. 105, 384 N.W.2d 92, 94–95 (1986) (rejecting application of neutral principles if a hierarchical relationship exists). A state, however, is not required to consider any and all neutral principles in resolving religious property disputes. *See Jones,* 443 U.S. at 602, 99 S.Ct. at 3025 (" 'a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters' " (quoting *Maryland & Va. Eldership,* 396 U.S. at 368, 90 S.Ct. at 500 (Brennan, J., concurring) (emphasis in original))). The Church has proffered no Missouri case law that looks at the relationship of the two churches to the same extent as does Michigan, and we decline to divine an intent on the part of the Missouri courts to do so. Indeed, the *Elijah Parish* court expressly declined to consider any hierarchical "form of organization" in resolving such property disputes because the neutral principles sufficiently accommodate all forms of religious governance. 682 S.W.2d at 467. So long as the focus is on the application of neutral Missouri legal principles to the property dispute, the inquiry does not implicate ecclesiastical affairs and run afoul of *Milivojevich.*

### III.

Although an inquiry into the relationship between the two institutions is irrelevant under Missouri law for resolution of the property issues, such a threshold inquiry is necessary to determine if we have any power to resolve the controversy over who controls the pulpit at Faith Mission. If indeed Faith Mission is part of the Church's hierarchy, then we may express no opinion on the issue and must defer to the highest ecclesiastical determination within that authority. *See Jones,* 443 U.S. at 602, 99 S.Ct. at 3024–25; *Milivojevich,* 426 U.S. at 724–25, 96 S.Ct. at 2387–88. Conversely, if no such hierarchical relationship exists, we are bound to prevent the rights of the local congregation from

being trammeled by an obtrusive national organization.

The district court found that Faith Mission existed in an "independent relationship with" the Church, rather than under the aegis of the Church's hierarchy. As evidence of this, the district court gave credence to a number of factors. Although doctrinally in conformity with Church practice, Lambert exercised complete managerial authority over Faith Mission. Lambert's stated intent was clear, open, and accepted by the jurisdictional bishop. Never in Faith Mission's history, until the events leading to this suit, had the Church attempted to exercise any control over Faith Mission. The neutral principles earlier applied to the property issue, in particular Faith Mission's articles of incorporation as well as the titling of property in its own name, provide further weighty support to the finding of independence.

▉ Having reviewed the record, we find no clear error in the district court's finding that Faith Mission is independent from the Church. Even assuming that the Church is a hierarchical institution, there remains no clear error in the determination that Faith Mission was not a part of that hierarchy. Whereas *Milivojevich* dealt with an acknowledged hierarchical relationship, *see* 426 U.S. at 715 & n. 9, 96 S.Ct. at 2383 & n. 9, here we have a local congregation that considered itself autonomous from its inception. In *Milivojevich,* the diocesan constitution was approved by the mother church. *Id.* at 700–01, 96 S.Ct. at 2376–77. That constitution required the diocese to obey the hierarchical pronouncements of the mother church. *Id.* at 701, 96 S.Ct. at 2376–77. Neither of these telling factors is present here. Rather, the life of the Faith Mission congregation revolves around its chosen pastor and board of trustees. In answering solely the question of whether there are indeed any ecclesiastical questions before us, we implicate neither hierarchical religious polity nor practice. Indeed, because the rule of deference is premised on the presence of a hierarchical authority, a necessary predicate of the Church's argument fails. Thus, *Milivojevich* is inapposite to this case.

The Church argues that our holding imposes an additional requirement for membership in its ranks by forcing the jurisdictional bishops into an onerous oversight role. We disagree, for our holding offers no impediment to the Church's "right to organize voluntary religious associations," *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 728, 20 L.Ed. 666 (1871), other than that the association must actually be voluntary. Any congregation is still free to affiliate itself with any national denomination or mother church without governmental interference, and certainly "[a]ll who unite themselves to such a body ... are bound to submit to it." *Id.* at 729, 96 S.Ct. at 2389-90. Likewise, however, those not so united need not so submit. To hold otherwise would risk infringing the religious freedom of autonomous localized congregations like Faith Mission. The Church's asserted actions are essentially *ultra vires,* in that Faith Mission has only nominal connections to the Church and is outside the scope of the Church's control. Accordingly, we give them no effect.

■ Nor is it our place to opine on the extent to which these two religious entities should interact doctrinally and defer to one another on ecclesiastical matters in light of their structural independence. Those matters are left to them. The Church is free to revoke Graham's credentials as a recognized Church minister and to deny him any ecclesiastical recognition, a decision that would be beyond the reach of our jurisdiction. Because Faith Mission is not part of the Church's hierarchy, however, it cannot be subject to the polity mandates of the national Church. The body to which we must defer, the highest ecclesiastical decision-making body within Faith Mission, i.e., its board of trustees, has not expressed a desire to have Graham removed; therefore, we have no authority to require him to vacate the pulpit.

■ As a final matter, the Church asserts that the district court erred in excluding certain hearsay testimony to the effect that a jurisdictional bishop gave Lambert permission to found Faith Mission in the late 1960s. The Church contends that the testimony was properly admissible as reputation concerning general history, as well as under the catch-all exception, *see* Fed.R.Evid. 803(20), 804(b)(5), and would establish the hierarchical nature of the churches' relationship. In an attempt to bolster its claim of admissibility, the Church points to the fact that numerous statements relating to Faith Mission's independence made by Lambert were admitted under the same hearsay exceptions. Because the Church did not offer the district court any explanation as to the statements' admissibility when they were objected to at trial, however, it cannot now show that the district court abused its discretion in excluding the hearsay evidence regarding the bishop's statements. *See Yost v. A.O. Smith Corp.,* 562 F.2d 592, 595 (8th Cir.1977). In any event, admission of the hearsay statements would not alter the proper application of Missouri's neutral principles of law in resolving the property dispute.

The judgment is affirmed.

JOHN R. GIBSON, Senior Circuit Judge, concurring and dissenting.

I concur in parts I and II of the Court's decision today, affirming the district court with respect to church property. These parts of the opinion decide a property dispute on the basis of neutral principles.

I respectfully dissent, however, with respect to part III of the Court's opinion, relating to occupancy of the pulpit and, thus, control of the spiritual charge of Faith Mission. The right to appoint a spiritual leader to a parish lies at the heart of issues of religious doctrine or polity that must be decided by some ecclesiastical authority. Indeed, the dispute between the Church and Faith Mission goes to whether there is any relation of spiritual authority between the two bodies. The court today makes a telling reference to the "spiritual relation" between the two institutions, *supra* at 2, which is the very thing in question.

It is true that *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), involved an admittedly hierarchical church. *Milivojevich* presented issues of control of church property, which could only be resolved by deciding an underlying religious dispute in-

volving the right to structure and administer a church and to appoint and defrock bishops of the church. These issues are essentially indistinguishable from the dispute in this case, which questions the very existence of any relationship between the Church and Faith Mission. As *Milivojevich* held, "[i]t suffices to note that the reorganization of the Diocese involves a matter of internal church government, an issue at the core of ecclesiastical affairs." 426 U.S. at 721, 96 S.Ct. at 2386. The issues in this case involve the existence and nature of the relationship between the Church and Faith Mission. That relationship is an ecclesiastical one, especially insofar as it involves authority to appoint a spiritual leader for a parish. As in *Milivojevich,* this is an issue that cannot be determined without "engaging in a searching and therefore impermissible inquiry into church polity." *Id.* at 723, 96 S.Ct. at 2387.

The First and Fourteenth Amendments prevent this Court and the district court from deciding such issues. Accordingly, I must respectfully dissent from part III of the Court's opinion.