**HEARTLAND PRESBYTERY, A Missouri Nonprofit Corporation, et al., Appellants,**

v.

**GASHLAND PRESBYTERIAN CHURCH, A Missouri Benevolent Corporation, Respondent.**

**No. WD 73064.**

Missouri Court of Appeals,
Western District.

.Jan. 10, 2012.

Application for Transfer to Supreme Court
Denied Feb. 28, 2012.

Application for Transfer
Denied May 29, 2012.

Allan V. Hallquist and Kathryn C. Goldsmith–Lee, Kansas City, MO, for appellant.

Glen S. Masters, North Kansas City, MO, Michael K. Whitehead, Kansas City, MO, and Jonathan R. Whitehead, Lee's Summit, MO, for respondent.

Before: GARY D. WITT, P.J., and JAMES E. WELSH and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

Gashland Presbyterian Church, a local Presbyterian congregation, terminated its affiliation with the Presbyterian Church (U.S.A.) ("PCUSA"), a national religious denomination, and with the PCUSA's Heartland Presbytery. Heartland initiated this action against Gashland, claiming that Gashland held title to its church property in trust for the denomination. The circuit court dismissed Heartland's first amended petition for failure to state a claim. Because Heartland's petition fails to allege facts which could establish a trust relationship under Missouri law, we affirm.

**Factual Background**

Gashland was incorporated on August 11, 1948, as the "Gashland Community

Church," and was originally affiliated with the Presbyterian Church in the United States of America. On October 11, 1948, the Presbytery of Kansas City of the Presbyterian Church in the United States of America deeded property located at 8029 North Oak Trafficway in Kansas City to Gashland. The grantee is identified in the Corporation Warranty Deed as "Gashland Community Church, Gashland, Missouri." The deed recites that the property was transferred to Gashland in exchange for "one dollar and other good and valuable considerations [sic]." Gashland constructed a church on the property.

In 1958, the Presbyterian Church in the United States of America merged with the United Presbyterian Church of North America to form the United Presbyterian Church in the United States of America ("UPCUSA"), which in turn merged with the Presbyterian Church in the United States in 1983 to form the PCUSA.

According to Heartland's first amended petition, the PCUSA is an unincorporated association of "Reformed Christian believers." Individual churches are governed by sessions, comprised of the church's pastors and elders. Multiple sessions are governed by a district governing body known as a presbytery, which is in turn governed by a regional body, the synod. Synods are governed by the General Assembly, the highest governing body within the PCUSA. While it was associated with the PCUSA, Gashland fell within the Heartland Presbytery.

The PCUSA's Book of Order is part of the denomination's Constitution. Section G–8.0201 of the Book of Order, which we refer to as the "Property–Trust Clause," provides:

> All property held by or for a particular church, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.).

Heartland alleges that a version of the Property–Trust Clause was first adopted by the UPCUSA in 1981, and was carried forward in PCUSA's Constitution following its formation in 1983.[1]

On September 30, 2007, Gashland submitted a request to Heartland for dismissal from the PCUSA with property, so that it could affiliate with the Evangelical Presbyterian Church. Having received no response, Gashland sent a letter to Heartland on January 14, 2008, stating that it had unilaterally disaffiliated from the presbytery and the PCUSA, and affiliated instead with the Evangelical Presbyterian Church. On March 6, 2008, Heartland's Administrative Commission notified Gashland that it would hold a hearing on Gashland's request for dismissal with property on April 10, 2008. By letter dated April 7, 2008, Gashland notified the Commission that it would not appear at the April 10 hearing. The Administrative Commission nonetheless held the hearing, without

1. Other denominations adopted similar provisions in response to the United States Supreme Court's decision in *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), which we discuss below. The Protestant Episcopal Church in the United States of America was perhaps the first to do so, formulating the well-known "Dennis Canon": "[a]ll real and personal property held by or for the benefit of any Parish ... is held in trust for this Church." *See* Brian Schmalzbach, "Confusion and Coercion in Church Property Litigation," 96 Va. L.Rev. 443, 451 n.28 (2010).

Gashland's participation. After a series of attempts to engage Gashland in further proceedings, the Administrative Commission determined that reconciliation was not possible and initiated the present litigation, seeking to enforce the denomination's rights under the Property-Trust Clause.

Heartland filed its petition on November 23, 2009.[2] After Gashland moved to dismiss the petition for failure to state a claim, Heartland was granted leave to file an amended petition. Following the filing of Heartland's first amended petition, Gashland again moved to dismiss. The circuit court granted Gashland's motion, and dismissed Heartland's amended petition with prejudice. This appeal follows.

### Standard of Review

> The standard of review for a trial court's grant of a motion to dismiss is *de novo.* When this Court reviews the dismissal of a petition for failure to state a claim, the facts contained in the petition are treated as true and they are construed liberally in favor of the plaintiffs. If the petition sets forth any set of facts that, if proven, would entitle the plaintiffs to relief, then the petition states a claim.

*Adams v. One Park Place Investors, LLC,* 315 S.W.3d 742, 753 (Mo.App. W.D.2010) (quoting *Lynch v. Lynch,* 260 S.W.3d 834, 836 (Mo. banc 2008)). "We will affirm the dismissal if it is supported by any ground, regardless of whether the trial court relied on that ground." *Smith v. Bowersox,* 330 S.W.3d 103, 105–06 (Mo.App. S.D.2010) (citation and internal quotation marks omitted).

### Analysis

Heartland asserts two Points Relied On. In the first, it contends that the trial court erred in dismissing its amended petition because Gashland's Articles of Agreement and amended By-Laws, in conjunction with the PCUSA's Book of Order, establish that Gashland held the disputed property in trust for the PCUSA. In its second Point, Heartland argues that it stated a claim for breach of contract against Gashland.

Although the present case involves a dispute between religious organizations over the ownership of property on which religious activities are conducted,

> [t]here can be little doubt about the general authority of civil courts to resolve this question. The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively. [¶] It is also clear, however, that the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters,

2. Gashland raises no issue concerning the Heartland Presbytery's right to prosecute this action to vindicate PCUSA's interest in Gashland's property.

> whether the ritual and liturgy of worship or the tenets of faith.

*Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (citations and internal quotation marks omitted).

The judicial approach to church property disputes has evolved over time. In earlier English cases, courts sought to resolve such disputes by determining, for themselves, "what is the true standard of faith in the church organization, and which of the contending parties before the court holds to this standard." *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666 (1871). The United States Supreme Court rejected this approach in *Watson,* and instead adopted a "rule of deference" under which civil courts would defer to the decision of the highest adjudicatory authority within a hierarchical church structure:

> In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, ... is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Id.*[3] Missouri adhered to this "rule of deference" for much of the previous century. *See, e.g., Hayes v. Manning,* 263 Mo. 1, 172 S.W. 897, 904–06 (Mo. banc 1914).[4]

In a series of later cases, however, the United States Supreme Court held that another approach was constitutionally permissible: "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Presbyterian Church in the U.S. v. Mary Eliz. Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). The Court later explained that

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all

3. *Watson* adopted different principles for congregational churches, and for cases in which the deed or will of the property donor established the terms of an express trust. *See* discussion in *Episcopal Church in the Diocese of Conn. v. Gauss,* 302 Conn. 408, 28 A.3d 302, 312–13 (2011); *Episcopal Church Cases,* 45 Cal.4th 467, 87 Cal.Rptr.3d 275, 198 P.3d 66, 75 (2009).

4. Prior to *Hayes,* the Missouri Supreme Court had adopted an analysis which bore similarities to the English cases:

> An analysis of our cases show that, in cases where civil or property rights are involved, the courts of this state will inquire into matters ecclesiastical....
>
> ... [I]t would be a flagrant violation of constitutional mandates for the civil courts of this state, in cases involving property rights, to attempt to hide behind the judgments and decrees of any ecclesiastical tribunal[.] The duty of our courts in such cases is to investigate the facts, and all the facts, bearing upon the issue as to property rights. If that investigation in a measure intrudes upon the decrees of bodies having no authority to pass upon property rights, there is no remedy for it. Of those pure ecclesiastical questions of creed, faith, or church discipline we should wash our hands, unless an investigation thereof is required to determine property rights. If for that purpose it should be required, our constitutional duty is to so investigate.

*Boyles v. Roberts,* 222 Mo. 613, 121 S.W. 805, 811 (Mo. banc 1909); *see also id.* at 813 ("in such investigation of property rights the courts will take and compare the two creeds, and award the property to the parties, whether in the majority or the minority, who have adhered to the doctrine and faith which existed prior to the schism or division"); *Hayes,* 172 S.W. at 908–09 (Graves, J., dissenting). *Boyles* was overruled in the *Hayes* case. 172 S.W. at 904.

forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.

This is not to say that the application of the neutral-principles approach is wholly free of difficulty. The neutral-principles method ... requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.

*Jones,* 443 U.S. at 603–04, 99 S.Ct. 3020.

Following *Jones,* the Missouri Supreme Court adopted this "neutral principles" approach as the sole method for resolution of church-property disputes. *Presbytery of Elijah Parish Lovejoy v. Jaeggi,* 682 S.W.2d 465, 467 (Mo. banc 1984); *see also, e.g., Church of God in Christ, Inc. v. Graham,* 54 F.3d 522, 526 (8th Cir.1995) (Missouri law); *Mo. Dist. Church of the Nazarene v. First Church of the Nazarene of Caruthersville,* 312 S.W.3d 428, 430 n. 4 (Mo.App. S.D.2010); *Reorg. Church of Jesus Christ of Latter Day Saints v. Thomas,* 758 S.W.2d 726, 729 (Mo.App. W.D. 1988).

Therefore, in addressing Heartland's arguments on appeal, we "rel[y] exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges," *Jones,* 443 U.S. at 603, 99 S.Ct. 3020 (quoted in *Elijah Parish,* 682 S.W.2d at 468), which were "developed for use in all property disputes." *Hull Church,* 393 U.S. at 449, 89 S.Ct. 601. Under those principles, Heartland's trust and contract arguments both fail.

## I.

■ In *Elijah Parish,* the Missouri Supreme Court looked to the deed, the local congregation's charter, and the denomination's constitution to resolve the church-property dispute before it. 682 S.W.2d at 473.

### A.

Heartland acknowledges that, in this case, the deed does not create a trust in its favor. To the contrary, the deed states, in unqualified terms, that the grantee of the property is "Gashland Com-

munity Church, Gashland, Missouri."[5] There is no reference to Gashland taking title to the property in a representative or fiduciary capacity. Moreover, the *grantor* of the property was a predecessor presbytery to Heartland; the deed does not reflect any reservation of rights by the grantor, or any limitation on the property interests it transferred to Gashland. To the contrary, in the deed Heartland warranted that it was transferring the full fee in the property to Gashland, and that *no one* held any adverse interest to the property (excepting restrictions and easements of record). The deed recites that

> TO HAVE AND TO HOLD, The premises aforesaid, with all and singular the rights, privileges, appurtenances and immunities thereto belonging or in any [sic] anywise appertaining, unto [Gashland] and unto its heirs and assigns forever, [Heartland] hereby covenanting that it is lawfully seized of an indefeasible estate in fee in the premises herein conveyed; that it has good right to convey the same; that the said premises are free and clear from any incumbrances done or suffered by it or those under whom it claims; and that [Heartland] will warrant and defend the title of the said premises unto [Gashland] and unto its heirs and assigns forever, against the lawful claims and demands of all persons whatsoever.

Finally, the deed reflects that the property was transferred in exchange for "good and valuable considerations [sic]," suggesting that this was not a gratuitous transfer.

The 1948 deed plainly fails to establish the existence of a trust. The Missouri trust code provides that,

> [o]ther than for a conveyance by which a trust may arise or result by the implication or construction of law, all declarations or creations of trust of any lands, tenements or hereditaments shall be manifested and proved by some writing signed by the party who is, or shall be, by law, enabled to declare such trusts, or by the party's last will, in writing, or else they shall be void.

§ 456.4–407.2.[6] Similar provisions appeared in predecessor statutes. *See* § 456.010, RSMo 2000; § 3494, RSMo 1939.[7]

■ In addition, Missouri's trust code provides, with exceptions not relevant here, that "a trust is created only if ... the settlor indicates an intention to create the trust," § 456.4–402.1(2), which may include a "declaration by the owner of property that the owner holds identifiable property as trustee." § 456.4–401(2). As Heartland itself recognizes, the requirement that a settlor state an intention to create an express trust pre-dates the adoption of Missouri's current trust code. As this Court explained in *St. Louis Uniformed Firemen's Credit Union v. Haley,* 190 S.W.2d 636 (Mo.App.1945),

> The law is well settled that in order to create an express trust, it is not essen-

5. The documents to which we refer in this opinion were attached to Heartland's amended petition; they are therefore properly considered in deciding Gashland's motion to dismiss. *Hendricks v. Curators of Univ. of Mo.,* 308 S.W.3d 740, 747 (Mo.App. W.D.2010)

6. Unless otherwise indicated, statutory citations refer to the RSMo 2000, as updated through the 2010 Cumulative Supplement.

7. The parties do not address which version of Missouri's trust statutes should apply here: the present statute, the version in existence at the time of Gashland's initial acquisition of the property in 1948, or some intervening statute. We therefore do not decide the issue. We note that the present trust code contains an explicit retroactivity provision which might be relevant to this question. § 456.11–1106.

tial that any particular form be followed, or that the words 'trust' or 'trustee' or their equivalent be used. On the contrary, the primary consideration in all such cases is the intention of the settlor or creator; and any words which indicate with sufficient certainty an intention to create a trust will be effective for that purpose.

*Id.* at 639; *see also, e.g., Gardner v. Bernard,* 401 S.W.2d 415, 421 (Mo.1966); *Penney v. White,* 594 S.W.2d 632, 639 (Mo. App. W.D.1980) ("In order to create a trust the settlor must show intention to create a trust. That intention may be manifested by word or conduct, without regard to any particular terminology of trusteeship. If the words import the intent to establish a trust, they have that effect.").

Heartland does not argue that the 1948 deed complies with these legal principles, and it does not appear that any such argument would succeed. Nothing in the 1948 deed expresses an intention, either of the grantor or the grantee, to create a trust. Moreover, under the statute "[a]n express trust [in land] can not be created or proved by a parol agreement." *Woodard v. Cohron,* 345 Mo. 967, 137 S.W.2d 497, 498 (1940); *see also, e.g., Parker v. Blakeley,* 338 Mo. 1189, 93 S.W.2d 981, 987 (1936); *Long v. Conrad,* 42 S.W.2d 357, 361 (Mo.1931). While "[t]he trust need not be declared in a conveyance of property to the trustee but ... can be proved by a separate writing," *Ervin v. Davis,* 355 Mo. 951, 199 S.W.2d 366, 369 (1947),[8] Heartland points to no *other* document executed contemporaneously with, or prior to, the 1948 conveyance which could satisfy the requirement that the intent to create a trust in land be expressed in writing. Nor does Heartland argue that the 1948 deed reflects "a conveyance by which a trust may arise or result by the implication or construction of law." § 456.4–407.2.[9]

Heartland argues that these principles of Missouri trust law are inapplicable here. Heartland emphasizes that *Jones* and *Elijah Parish* analyzed claims that a congregation held property in trust for a denomination without reference to the requirement that the settlor express an intention to create a trust, or the requirement (in the case of trusts involving real property) that the trust be evidenced by a writing. As we explain below in § I.D., however, Heartland reads too much into the *Jones* and *Elijah Parish* decisions; we do not read those cases as necessarily exempting church-property disputes from the well-established and generally applicable principles of Missouri trust law described above. In any event, as we discuss below, the other considerations on which Heartland relies do not assist it in the circumstances of this case, even if—in another case—those considerations might establish that a denomination had an enforceable beneficial interest in a congregation's property.

### B.

Although it acknowledges that the deed does not substantiate a trust arrangement, Heartland argues that Gashland's organi-

8. Citing *Stephenson v. Stephenson,* 351 Mo. 8, 171 S.W.2d 565, 568 (1943); *Ketcham v. Miller,* 37 S.W.2d 635, 637 (Mo.1931); *see also, e.g., Stevenson v. Haynes,* 220 Mo. 199, 119 S.W. 346, 349 (1909).

9. As a general proposition, Missouri recognizes two varieties of implied trust: a constructive trust, and a resulting trust. *Parker,* 93 S.W.2d at 988; *Reorg. Church of Jesus Christ of Latter Day Saints v. Thomas,* 758 S.W.2d 726, 733 (Mo.App. W.D.1988); *In re McGehee,* 342 B.R. 587, 590 (Bankr.W.D.Mo. 2006). Heartland does not invoke either doctrine.

zational documents, considered in light of the Property–Trust Clause contained in the PCUSA's Book of Order, establish that Gashland held its property in trust for the denomination. In this Court, Heartland relies on two of Gashland's corporate documents: its original Articles of Agreement adopted in 1948, and amended By–Laws adopted in 1987.

"Corporate articles and bylaws are to be construed according to general rules governing contracts." *Boatmen's First Nat. Bank of West Plains v. Southern Missouri Dist. Council of the Assemblies of God,* 806 S.W.2d 706, 714 (Mo.App. S.D.1991); *see also, e.g., Kansas City Univ. of Med. & Biosciences v. Pletz,* 351 S.W.3d 254, 259 (Mo.App. W.D.2011); *Exec. Bd. of Mo. Baptist Conv. v. Windermere Baptist Conf. Ctr.,* 280 S.W.3d 678, 687 (Mo.App. W.D.2009).

For present purposes, the most significant provisions of Gashland's 1948 Articles of Agreement are Articles I and VII, which provide in relevant part:

*ARTICLE I.*

The name of this corporation shall be Gashland Community Church, Gashland, Missouri, connected with and ecclesiastically subject to the Presbytery of Kansas City, Synod of Missouri, and the General Assembly of the Presbyterian Church in the United States of America.

. . . .

*ARTICLE VII.*

. . . [This corporation] shall have the power to acquire by purchase, gift, or in any lawful manner any property, real, personal, or mixed, desirable or necessary for fulfilling the objects of this corporation, and the title to the same shall vest in the Gashland Community Church of Gashland, Missouri, in its corporate capacity, and such property may be sold, leased, mortgaged, conveyed, pledged or otherwise dealt with by instruments duly executed by its proper officers; provided that no real estate shall be conveyed in any manner unless and until such conveyance shall be approved and ordered by a two-thirds vote of the members present at a regular or special meeting duly called for that purpose, and further approved and ordered by the Board of Trustees.

Gashland's Articles of Agreement cut strongly against Heartland's present arguments. First, Article VII states, in no uncertain terms, that title to property acquired by Gashland "shall vest in the Gashland Community Church of Gashland, Missouri, in its corporate capacity." This language makes no reference to the acquisition of property in a representative or fiduciary capacity, and does not contemplate the possession of any beneficial interest in Gashland's property by other persons or entities. "The fundamental nature of a trust is a *division of title:* the trustee holds legal title and the beneficiary holds equitable title." *Moore v. Moore,* 189 S.W.3d 627, 636 (Mo.App. W.D.2006) (emphasis added) (citing *Mercantile Trust Co., N.A. v. Hardie,* 39 S.W.3d 907, 913 (Mo. App. S.D.2001)). Gashland's Articles of Agreement contemplate no such "division of title" to its property.

Furthermore, Article VII makes clear that no real property owned by Gashland can be conveyed unless two prerequisites are met: first, a two-thirds vote by members at a regular or special meeting; and second, approval of Gashland's Board of Trustees. Although Heartland's briefing does not specify *when* it contends that the PCUSA or its predecessors acquired a beneficial interest in Gashland's property, only two alternatives suggest themselves: either in 1948, when Gashland first ac-

quired the property from the Presbytery of Kansas City; or instead in 1981 or thereafter, following adoption of the Property–Trust Clause by PCUSA's predecessor. As explained above, the 1948 deed unequivocally states that Gashland acquired the property in its own name, and not in any representative or fiduciary capacity; moreover, the Property–Trust Clause on which Heartland's claims depend did not exist at that time. We therefore fail to see how any trust could have been created, expressly or by implication, at the time of Gashland's initial acquisition of the property in 1948. To the extent Heartland argues that a trust was created in 1981 or thereafter, however, this would require a *conveyance* by Gashland of an interest in property which it owned, until that time, free and clear. *Moore,* 189 S.W.3d at 636 (equitable interests may vest in same manner as legal interests, and may be transferable and assignable); *Mercantile Trust,* 39 S.W.3d at 913 (same).[10] Yet Heartland does not allege that the formalities required by Article VII—which apply whenever Gashland's real property is "conveyed in any manner"—were followed.

Heartland argues that Article I of the 1948 Articles of Agreement, which specifies that Gashland is "connected with and ecclesiastically subject to" PCUSA's predecessor denomination, establishes that Gashland agreed to be bound by all of the provisions of the denomination's present and future Constitutions. We disagree. It is true that, in the context of religious organizations, references to a "connectional" relationship between a congregation and a denomination may indicate a hierarchical, rather than congregational, church structure.[11] We also recognize that some courts have held that the existence of a hierarchical or connectional structure may make application of the "neutral-principles" approach inappropriate, or may heavily tilt the balance in a church-property dispute in favor of the denomination.[12] However, in *Elijah Parish* the Missouri Supreme Court held that it "need not concern itself with any issue with regard to

10. Heartland does not argue that the circumstances of this case support the recognition of an *implied* trust. *See* note 9, above.

11. *See, e.g., Jones,* 443 U.S. at 597–98, 99 S.Ct. 3020 ("The PCUS has a generally hierarchical or connectional form of government, as contrasted with a congregational form."); *Daniel v. Wray,* 158 N.C.App. 161, 580 S.E.2d 711, 717 (2003) ("In determining these [property] rights, a central question is whether the church is connectional or congregational. Connectional churches are governed by large bodies and individual congregations bear the same relation to the governing body as counties bear to the State. Congregational churches are independent republics, governed by the majority of its members and subject to control or supervision by no higher authority.") (citations and internal quotation marks omitted); *Presbytery of the Covenant v. First Presbyterian Church of Paris, Inc.,* 552 S.W.2d 865, 870 (Tex.Civ.App.1977) ("It is undisputed and has been uniformly recognized by the decisions that PCUS is ... connectional or hierarchical, at least as to ecclesiastical matters and church government.").

12. *See, e.g., Lamont Community Church v. Lamont Christian Reformed Church,* 285 Mich. App. 602, 777 N.W.2d 15, 28 (2009) (under Michigan law, application of neutral-principles approach to hierarchical church generally inappropriate); *Daniel,* 580 S.E.2d at 717 (N.C.App.2003) ("As a general rule the parent body of a connectional church has the right to control the property of local affiliated churches, and, as a corollary, this right will be enforced in civil courts."); *Protestant Episcopal Church in Diocese of N.J. v. Graves,* 83 N.J. 572, 417 A.2d 19, 24 (1980) ("Only where no hierarchical control is involved, should the neutral principles of law principle be called into play. Here it has been established that the Protestant Episcopal Church is a completely integrated hierarchical body.... This is dispositive of the case. [The national church was] entitled to the relief sought.").

UPCUSA's form of organization," and specifically whether it was a hierarchical or congregational church, "[s]ince the neutral principles approach 'accommodate[s] all forms of religious organization and polity.'" 682 S.W.2d at 467 (quoting *Jones,* 443 U.S. at 603, 99 S.Ct. 3020); *see also Church of God in Christ, Inc. v. Graham,* 54 F.3d 522, 526–27 (8th Cir.1995) (Missouri law; refusing to apply rule of deference in the context of a hierarchical church, because "the *Elijah Parish* court expressly declined to consider any hierarchical 'form of organization' in resolving such property disputes because the neutral principles sufficiently accommodate all forms of religious governance"). The "connected with" language of Gashland's Articles cannot alone establish PCUSA's trust interest.

Moreover, besides the general reference to Gashland being "connected with" the PCUSA's predecessor, Article I also contains a more specific statement concerning the extent to which Gashland would be governed by the denomination's precepts: Article I specifies that Gashland would be "*ecclesiastically* subject to" the denomination. By providing that Gashland would be "*ecclesiastically* subject to" the denomination, Gashland's Articles of Agreement imply that it would *not* be subject to the denomination's authority in *non*-ecclesiastical matters. *Gen. Am. Life Ins. Co. v. Barrett,* 847 S.W.2d 125, 133 (Mo.App. W.D.1993) (applying rule of "*expressio unius est exclusio alterius,*" or "'the expression of one thing is the exclusion of another,'" in interpreting contract).

█ This property dispute does not present an "ecclesiastical" question.

> "An ecclesiastical matter is one that concerns doctrine, creed, or form of worship of the church, or the adoption and enforcement within a religious association of needful laws and regulations for the government of the membership, and the power of excluding from such associations those deemed unworthy of membership by the legally constituted authorities of the church; and all of such matters are within the province of the church tribunals and their decisions will be respected by the civil courts."

*Marr v. Galbraith,* 238 Mo.App. 497, 184 S.W.2d 190, 193–94 (1944) (quoting *Olear v. Haniak,* 235 Mo.App. 249, 131 S.W.2d 375, 380–81 (1939)). Questions concerning property ownership generally do not implicate such "ecclesiastical matters":

> The question presented here is not one of creed, doctrine, descipline [sic] or church government, but, on the contrary, calls for the construction of a written instrument (a deed) which involved only the title of property. We need not and do not discuss the power and authority of the Methodist General Conference or its supreme judiciary body over its various individual churches, organizations and officers concerning any matter of faith, creed, church government, or any other ecclesiastical question.

*Id.* at 194; *see also Reorg. Church of Jesus Christ of Latter Day Saints v. Thomas,* 758 S.W.2d 726, 731 (Mo.App. W.D. 1988) ("Although civil courts have no ecclesiastical jurisdiction and ordinarily cannot question acts of church discipline or the removal of a pastor or a member[,] if a controversy involves protection of civil or property rights, even though arising out of a religious dispute, the civil courts will exercise their jurisdiction to protect such rights.").[13] Article I of Gashland's Articles

13. In the trial court, Heartland also relied on Amended Articles of Agreement adopted by Gashland in 1987. It does not rely on the 1987 Amended Articles in this appeal, based

of Agreement does not establish its agreement to be bound by the property provisions of the PCUSA's Constitution; instead, it suggests the opposite.

C.

Heartland also argues that provisions of Gashland's 1987 By–Laws establish Gashland's agreement to be bound by PCUSA's Constitution, including the Property–Trust Clause. Heartland relies on two provisions of the 1987 By–Laws:

ARTICLE I

NAME AND RELATIONSHIP

*Section 1.* The name of the Church shall be the Gashland Presbyterian Church of Kansas City, Missouri. The Church, being a particular congregation of the Presbyterian Church (U.S.A.) and a member of the Heartland Presbytery, recognizes that the Constitution of the Presbyterian Church (U.S.A.) is, in all of its provisions, obligatory upon it and its members.

. . . .

ARTICLE X

GENERAL PROVISIONS

. . . .

*Section 5.* Nothing in these By–Laws shall nullify or contravene the provisions of the Constitution of the Presbyterian Church (U.S.A.) and they shall be construed only in conformity therewith.

Heartland argues that the 1987 By–Laws have the effect of submitting Gashland to all of the provisions of the PCUSA's Book or Order, including the Property–Trust Clause. If the By–Laws are read in the manner Heartland suggests, however, they would negate three provisions of Gashland's Articles of Agreement: (1) the statement in Article I of the Articles that Gashland is only "*ecclesiastically* subject to" the denomination; (2) the statement in Article VII of the Articles that title to Gashland's property vests, without qualification, in Gashland itself, in its corporate capacity; and (3) the statement in Article VII of the Articles that Gashland's property can only be conveyed to others pursuant to specific authorization of its members (by a two-thirds vote), and of its Board of Trustees. To the extent of any conflict, however, the 1987 By–Laws must yield to Gashland's Articles of Agreement. § 355.116 ("The bylaws may contain any provision for regulation and managing the affairs of the corporation that is not inconsistent with law or the articles of incorporation."); *Pletz,* 351 S.W.3d at 258 (under § 355.116, "a non-profit corporation's Articles of Incorporation take precedence over inconsistent provisions of its Bylaws"); *Boatmen's First Nat'l Bank,* 806 S.W.2d at 713 (same).

If the By–Laws are read as Heartland suggests, they would be inconsistent with

on Gashland's claim that those Amended Articles had not been approved by the Circuit Court of Clay County as required by §§ 352.060 and .070. We note that those Amended Articles of Agreement deleted the statement in the 1948 Articles that Gashland was "ecclesiastically subject to" the denomination, deleted the 1948 Articles' specification of the manner in which property conveyances would be approved, and added a new concluding phrase to the property provision: "; and in accordance with the rules and regulations of the Presbyterian Church (U.S.A.)." These attempted, later amendments suggest that the 1948 Articles of Agreement were not to the same effect. *Cf. Elijah Parish,* 682 S.W.2d at 473 ("UPCUSA's adoption of the express trust amendment in 1981 ... 'provides additional support to our conclusion that the Book of Order as it existed [prior to that date] did not contain provisions creating a trust of local property' ") (quoting *Foss v. Dykstra,* 342 N.W.2d 220, 224 n. 7 (S.D. 1983)).

Gashland's Articles of Agreement, and are therefore ineffective. Heartland does not argue that By–Laws which are inconsistent with the Articles could nevertheless create the trust it now seeks to enforce. Given Gashland's Articles of Agreement, the By–Laws could not have the effect of subjecting Gashland's property to the Property–Trust Clause, and conveying a beneficial interest in that property to the PCUSA.[14]

Even if the By–Laws (on Heartland's reading) were not inconsistent with Gashland's Articles of Agreement, we question whether the By–Laws' general statements that the PCUSA's Constitution is "obligatory upon" Gashland, and that nothing *in the By–Laws* "shall nullify or contravene the provisions of the [PCUSA's] Constitution," would be sufficient to establish an express trust. While it may be that "words of technical and legally definitive meaning," such as "trustee" or "trust," are unnecessary, under Missouri law "the evidence to establish a trust must be cogent, clear and convincing, and ... ordinarily it should dispel all doubt"; "the court must be completely and fully convinced that a trust was created." *Gardner v. Bernard*, 401 S.W.2d 415, 423 (Mo.1966). Given the specific property provisions of Gashland's Articles of Agreement, we would be hard-pressed to find that the By–Laws' general statements concerning subordination to the PCUSA's Constitution establish a trust by clear, cogent and convincing evidence, dispelling all doubt as to whether Gashland intended a trust relationship.

### D.

Heartland also argues that PCUSA's Book of Order, standing alone, establishes the existence of a trust. In making this argument, Heartland relies heavily on the following passage from *Jones v. Wolf*, in which the majority defended its endorsement of the "neutral principles" approach:

> The dissent also argues that a rule of compulsory deference is necessary in order to protect the free exercise rights "of those who have formed the association and submitted themselves to its authority." This argument assumes that the neutral-principles method would somehow frustrate the free-exercise rights of the members of a religious

14. In its Reply Brief, Heartland cites to Article VI of Gashland's 1948 Articles of Agreement, which provides that "[t]he corporation shall provide by-laws for its government not inconsistent with these Articles of Agreement, the laws of the State of Missouri and the United States, or inconsistent with the government discipline and direction for worship of the Presbyterian Church in the United States of America." This provision—first raised by Heartland in its Reply Brief—cannot independently establish Heartland's right to relief. First, the reference to the denomination's "government discipline and direction for worship" does not necessarily refer to temporal matters such as the ownership of property, which are otherwise explicitly addressed in Article VII; this phrase must be read in light of the statement in Article I that Gashland would be "ecclesiastically subject to" the denomination. *See Marr v. Galbraith*, 184 S.W.2d at 194 (interpretation of deed to real property, in dispute between religious denomination and congregation, did not present a question "of creed, doctrine, discipline or church government"). Moreover, while Article VI states that Gashland's *By–Laws* shall not be inconsistent with the denomination's "government discipline and direction for worship," it does not directly address the content of the *Articles themselves.* Further, Article VI also specifies that the By–Laws shall not be inconsistent with the Articles, which contain specific provisions governing the titling and conveyance of Gashland's property. We will not read Article VI as authorizing Gashland's By–Laws to adhere to all of the provisions of the denomination's Constitution, where, in order to do so, the By–Laws would be inconsistent with the Articles themselves.

association. Nothing could be further from the truth. The neutral-principles approach cannot be said to "inhibit" the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.

443 U.S. at 605–06, 99 S.Ct. 3020 (citation and footnote omitted). Relying on this passage, Heartland argues that

> the Supreme Court described three options for denominations such as the PCUSA to "ensure" that the church property remained with its loyal members: include trust language in the deeds, corporate charters, or the constitution of the general church.... [¶] The Supreme Court then stated that civil courts must give effect to such express trusts, regardless of which of the three options the national church utilized.

Heartland reads the quoted passage from *Jones* far too broadly.[15] The intent of the quoted passage was to explain that, contrary to the dissent's characterization, a "neutral-principles" approach would not impose a particular property-rights regime on the parties, or infringe upon the rights of a denomination's adherents to order their affairs as they saw fit. Instead, like the discussion earlier in the Court's opinion, the quoted passage simply makes clear that, like "private-law systems in general," the application of neutral principles of state property and trust law would afford "flexibility in ordering private rights and obligations *to reflect the intentions of the parties.*" *Id.* at 604, 99 S.Ct. 3020 (emphasis added). The recitation of the particular documents which might be employed to accomplish the parties' intentions can only be read as illustrative. We will not read the quoted passage as itself establishing the substantive property and trust law to be applied to church-property disputes, particularly where the very same passage contemplates (in its reference to "*other* neutral principles of state law") that the applicable law—like American property and trust law in general—would be *state,* rather than *federal,* law. Further, the statement that "the civil courts will be bound to give effect to" the parties' expressed intentions was explicitly conditioned on those intentions being "embodied in some legally cognizable form"—precisely the issue we address in this opinion.

Admittedly, *Jones* recognizes limitations on the application of neutral principles of state property and trust law: it requires that documents be reviewed "in purely secular terms," and that civil courts defer to "the authoritative ecclesiastical body"

15. We recognize that some courts have adopted Heartland's reading of this passage from *Jones. See, e.g., Presbytery of Greater Atlanta, Inc. v. Timberridge Presbyterian Church, Inc.,* 290 Ga. 272, 719 S.E.3d 446, 453, (2011); *Episcopal Church in the Diocese of Conn. v. Gauss,* 302 Conn. 408, 28 A.3d 302, 324–25 (2011); *Episcopal Church Cases,* 45 Cal.4th 467, 87 Cal.Rptr.3d 275, 198 P.3d 66, 80 (2009).

"where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property." 443 U.S. at 604, 99 S.Ct. 3020.

> Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.

*Id.* at 602, 99 S.Ct. 3020 (citation and internal quotation marks omitted); *see also Hull Church,* 393 U.S. at 449, 89 S.Ct. 601 (recognizing that "there are neutral principles of law, *developed for use in all property disputes,* which can be applied without 'establishing' churches to which property is awarded" (emphasis added)).[16] Thus, *Jones* holds that state courts may permissibly apply generally-applicable state property and trust law to church-property disputes. In this respect, *Jones* is similar to *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which held that state law would generally govern substantive issues in cases in which federal-court jurisdiction is based on diversity of citizenship. Just as no one would seriously contend that *Erie* established substantive principles of contract, tort or property law, *Jones* cannot be read to establish the substantive legal principles governing church-property disputes. *See Church of God in Christ, Inc. v. Graham,* 54 F.3d 522, 526–27 (8th Cir.1995) (Missouri law; under *Jones,* "[a] State ... is not required to consider any and all neutral principles in resolving religious property disputes").[17]

16. The last sentence of the quoted passage from *Jones* derives from Justice Brennan's concurring opinion in *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 368, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970). Notably, Justice Brennan gave the following example of "neutral principles of law" which a state court could permissibly apply to resolve a church-property dispute: "Under the 'formal title' doctrine, civil courts can determine ownership by studying deeds, reverter clauses, and general state corporation laws." *Id.* at 370, 90 S.Ct. 499.

17. The courts of numerous other States have expressly recognized that the "neutral principles of law" to which *Jones* refers are rules of *state law,* or have applied generally-applicable principles of state law to church-property disputes without further comment. *See, e.g., Episcopal Church in the Diocese of Conn. v. Gauss,* 302 Conn. 408, 28 A.3d 302, 316 (2011) ("Insofar as the [neutral-principles] approach has resulted in different outcomes in different states because of unique state statutes and common-law principles, *Jones* did not seem to regard the lack of uniform outcomes as a disadvantage.... *Jones* thus implicitly approved of possibly different outcomes in different jurisdictions and of allowing courts to develop still other approaches that might comport with local circumstances."); *Hope Presbyterian Church of Rogue River v. Presbyterian Church (U.S.A.),* 242 Or.App. 485, 255 P.3d 645, 661 (Or.App. 2011) (applying Oregon statute providing that a "trust to titled property may be created '[b]y declaration by the owner of property that the owner holds identifiable property as trustee' " (citation omitted)); *Episcopal Church Cases,* 45 Cal.4th 467, 87 Cal.Rptr.3d 275, 198 P.3d 66, 74 (2009) ("the United States Supreme Court has made ... clear ... [that] how state courts resolve church property disputes is a matter of state law," subject to First Amendment restrictions); *All Saints Parish Waccamaw v. Protestant Episcopal Church in the Diocese of S.C.,* 385 S.C. 428, 685 S.E.2d 163, 174 (2009) (applying general principle of state law that "[a] trust 'may be created by either declaration of trust or by transfer of property' " (citation omitted)), *cert. denied sub nom. Green v. Campbell,* — U.S. —, 130 S.Ct. 2088, 176 L.Ed.2d 580 (2010); *In re Church of St. James the Less,* 585 Pa. 428, 888 A.2d 795, 806 (2005) (" 'in cases where the resolution of a property dispute involves no inquiry

Heartland also argues that *Elijah Parish* establishes that the Property–Trust Clause is binding on Gashland. In *Elijah Parish,* the Missouri Supreme Court noted that Missouri statutes, the deed to the relevant property, and the congregation's charter and by-laws did not support the UPCUSA's claim of a right in the congregation's property. 682 S.W.2d at 473–74. The Court then observed that, "[i]n order for the national church to prevail under the neutral principles approach on the instant record it must do so on the basis of the Book of Order." *Id.* at 474. The Court continued its analysis by finding that no provision of the UPCUSA's Book of Order, as it existed prior to the adoption of the Property–Trust Clause in 1981, supported the denomination's claims. *Id.*

As this description makes clear, *Elijah Parish* did not address the legal effect of the Property–Trust Clause, for the simple reason that the Property–Trust Clause was not in place at the time the local congregation in *Elijah Parish* terminated its association with the UPCUSA. The Court's statement that, "[i]n order for [the UPCUSA] to prevail ... it must do so on the basis of the Book of Order," was simply a recognition that the *other* sources of possible property rights—Missouri statutes, the property deeds, and the congregation's organizational documents—had been found lacking. We do not read *Elijah Parish* as holding that the Book of Order would *necessarily* prevail over contrary language of deeds and the congregation's articles; instead, the Court simply observed that the Book of Order was the only remaining source of authority on which the UPCUSA could conceivably rely.

In arguing that the Property–Trust Clause in the PCUSA's Book of Order binds Gashland without regard to Gashland's own corporate documents, Heartland also relies on this Court's decision in *Executive Board of the Missouri Baptist Convention v. Carnahan,* 170 S.W.3d 437 (Mo.App. W.D.2005), in which we stated generally that

> the constitution, rules, and bylaws of an association define the contract between members. By joining the association, members agree to be bound by the terms of these governing documents. To both members and outsiders, these documents represent the expression of the contract that binds the group.

*Id.* at 447.

What Heartland ignores, however, is that under Missouri law the provisions of the PCUSA's Book of Order are not necessarily binding on Gashland, without some effective expression of Gashland's agreement to be bound by those provisions; this is particularly true where Heartland seeks to use the denomination's Constitution to impose a trust on Gashland's real property. Thus, the Southern District held in *Vikings USA Bootheel Mo. v. Modern Day Veterans,* 33 S.W.3d 709 (Mo.App. S.D. 2000), that a national non-profit organization which provided organizational and administrative assistance to its local affiliates, known as "subordinates," could not establish that the subordinate entities were bound to provisions of the national

into ecclesiastical questions, courts of this Commonwealth are to apply the same principles of law as would be applied to non-religious associations' " (citation omitted)); *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church,* 370 Md. 152, 803 A.2d 548, 565 (2002) ("neutral principles of law are principles that are 'applicable not only to religious bodies, but to public and private lay organizations and to civil governments as well' " (citation omitted)); *Daniel v. Wray,* 158 N.C.App. 161, 580 S.E.2d 711, 719 (2003) (in church-property dispute, discussing state law defenses under recording statute, statute of frauds, and adverse possession doctrine).

organization's articles of *incorporation*, merely by submitting the national organization's articles. In these circumstances, the national organization's claims necessarily failed, because "there is no proof that the restrictive clause [in the national organization's articles] was binding upon the subordinates." *Id.* at 712. Similarly, in *Church of God in Christ,* the Eighth Circuit held that a denomination's constitution was not binding on a local congregation, based on provisions of the congregation's own articles of incorporation which unambiguously stated that the congregation was "not bound by or subject to oversight by any other ecclesiastical body," and that "the corporation is not under the authority or jurisdiction of any bishop or any other person affiliated with the Church of God in Christ." 54 F.3d at 525. The Court held that these provisions of the congregation's articles, "and the language of the deeds vesting title and control over the property in the hands of the local congregation," were "[p]articularly damaging to the [denomination's] claims" that the congregation was bound by the property-disposition provisions of the denomination's constitution. *Id.* at 526; *see also Mo. State Teachers Ass'n v. St. Louis Suburban Teachers Ass'n,* 622 S.W.2d 745, 752 (Mo.App. E.D. 1981) (refusing to find that state teacher's association could prevent district association from disaffiliating where "there are no ... explicit references to the relationship between [the state association] and [the district] in [the district's] Articles of Incorporation," and that "there was no explicit agreement by [the district] ... to be bound by the constitution and by-laws of its parent").[18] While the provisions of Gashland's Articles of Agreement may not be as emphatic as those at issue in *Church of God in Christ,* they are to like effect with respect to property ownership and conveyance.

At the time of adoption of the Property–Trust Clause, the property in question was owned by Gashland, and Gashland alone. In order to establish an express trust on that property, fundamental principles of Missouri law required some effective expression of intent *by Gashland. See* discussion in § I.A., above. Absent an effective expression of Gashland's intent to create a trust, Heartland's reliance on the PCUSA's Book of Order must fail. *See All Saints Parish Waccamaw v. Protestant Episcopal Church in the Diocese of S.C.,* 385 S.C. 428, 685 S.E.2d 163, 174 (2009) (diocese's reliance on property-trust clause in denominational constitution, adopted after congregation's acquisition of property, ineffective; "It is an axiomatic principle of law that a person or entity must hold title to property in order to declare that it is held in trust for the benefit of another or transfer legal title to one person for the benefit of another."), *cert. denied sub nom. Green v. Campbell,* — U.S. ——, 130 S.Ct. 2088, 176 L.Ed.2d 580 (2010); *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church,* 370 Md. 152, 803 A.2d 548, 571 (2002) (reversing grant of summary judgment to denomination based on consideration of property provisions of denomination's constitution alone; "it is necessary to consider other documentation or circumstances

18. In the same vein, in *In re Church of St. James the Less,* 585 Pa. 428, 888 A.2d 795 (2005), the Pennsylvania Supreme Court applied the following neutral principle in a church-property dispute: "a member of a voluntary association is bound by amendments to the association's rules so long as the amendments (1) are duly enacted; and (2) do not deprive the member of vested property rights without the member's explicit consent." *Id.* at 807–08. Although we have found no Missouri case recognizing this specific principle, it appears to be consistent with the Missouri decisions discussed in the text.

to determine whether the local church has consented to the provision in the [denominational constitution] providing for the reversion of that property"); *Ark. Presbytery of the Cumberland Presbyterian Church v. Hudson,* 344 Ark. 332, 40 S.W.3d 301, 309 (2001) (rejecting denomination's reliance on property provisions of its constitution, adopted years after property conveyed to local congregation; noting that denomination's representatives "do not cite any cases that allow a grantor to impose a trust upon property previously conveyed without the retention of a trust").

E.

In its first Point, Heartland also cites to various other circumstances as establishing a trust arrangement. Thus, Heartland argues that the fact that the property was deeded to Gashland by the Kansas City Presbytery is relevant to its claims. However, the deed itself reflects that the transfer was made for "one dollar and other good and valuable considerations [sic]," not gratuitously; that deed also transfers an unrestricted fee to Gashland in its own name. Further, as we have explained above, Heartland cannot plausibly claim that a trust relationship was established in 1948, when the Property–Trust Clause on which its arguments depend was not even adopted until thirty-three years later.

Heartland attached to its amended petition correspondence reflecting Gashland's requests for the presbytery's approval of transactions by which Gashland sought to encumber or sell pieces of its property. Gashland apparently submitted these requests in compliance with § G–8.0501 of the Book of Order, which provides that "[a] particular church shall not sell, mortgage, or otherwise encumber any of its real property and it shall not acquire real property subject to any encumbrance or condition without the written permission of the presbytery transmitted through the session of the particular church." The UPCUSA relied on a similar provision of its Book of Order (§ 62.12) in *Elijah Parish. See* 682 S.W.2d at 471 n. 3 (describing provision). The Missouri Supreme Court found, however, that this provision of the Book of Order was not probative concerning the existence of a beneficial interest of the denomination in the congregation's property:

> Although § 62.12 gives the Presbytery supervisory authority over specified real estate transactions of a particular church, that section ... is silent with regard to any reversionary or trust interest of the national church with respect to the property of a local church which has disaffiliated.

*Id.* at 474. If, as *Elijah Parish* holds, the denomination's *power* to approve particular real-estate-related transactions is not probative of a beneficial interest, the *exercise* of that power cannot establish the sort of interest Heartland claims.

The documents attached to Heartland's amended petition actually cut against its present claim that the denomination had an ownership interest in Gashland's property. On June 26, 1989, Heartland approved Gashland's sale of an easement on its property to the City of Kansas City for $27,387.50. After approving the sale of the easement, Heartland's letter continued:

> The Presbytery also concurred with a recommendation from the Mission Strategy and Development Committee, that is going to all churches which are selling property or manses. That recommendation is as follows:
>
> "The Committee strongly urges all churches selling property to tithe such income to the Presbyterian Mission Program Budget or special mission

funds of Heartland Presbytery, such as the Heartland Growth Fund, the Small Church Fund, New Church Development, etc."

We realize that your congregation will have many needs for the money generated from the sale of this property, but hope that you will at least consider giving a tithe of these monies to the important mission of the Presbyterian Church beyond the local congregation.

Heartland's request for a donation from Gashland, and its recognition that Gashland possessed sole discretion over the disposition of the proceeds of the sale of its property, cut against its current claim that the PCUSA retained a beneficial interest in that property. *Cf. Elijah Parish,* 682 S.W.2d at 474 (security interest in congregation's property given to denomination to secure repayment of gift in the event of congregation's disaffiliation "was inconsistent with a claim of a right to control all property upon disaffiliation").[19]

In concluding our discussion of Point I, we note what Heartland has not argued that principles of estoppel, unjust enrichment, or other equitable doctrines prohibit Gashland from now denying that PCUSA has an enforceable interest in Gashland's property. Nor has Heartland argued that other provisions of the PCUSA's Book of Order, such as § G–8.0301, entitle it to relief.[20] Finally, in its briefing Heartland did not argue that dismissal was inappropriate because facts *other than* those discussed above would establish Gashland's agreement to be bound by the Book of Order's Property–Trust Clause. *Compare Mo. Dist. Church of the Nazarene v. First Church of the Nazarene of Caruthersville,* 312 S.W.3d 428 (Mo.App. S.D.2010) (reversing grant of summary judgment to local congregation where denomination contended that other facts, including participation of congregational representatives in denominational meetings, and congregation's submission of annual reports to denomination acknowledging binding force of denomination's constitution, established congregation's agreement to be bound to denomination's rules governing disposition of property). We emphasize that this opinion only addresses, and decides, the issues presented by Heartland on appeal.

19. Heartland also argues that Gashland's September 30, 2007 request for dismissal from the denomination, with property, "once again tacitly acknowledg[es] that it holds its property in trust for the use and benefit of the PCUSA and needs permission to withdraw it." As reflected by the fact that Gashland thereafter unilaterally withdrew from the PCUSA, however, Gashland's attempt to secure Heartland's acknowledgement of its property rights reflects an effort to resolve this matter amicably, rather than a concession that Heartland's consent was required.

Heartland also cites to the fact that, at the time Gashland acquired the property in 1948, Missouri courts generally applied the "rule of deference," under which the denomination's rights to Gashland's property would have been recognized. Even prior to *Elijah Parish,* however, Missouri courts independently interpreted documents conveying interests in property to be used for religious purposes. *See Marr v. Galbraith,* 238 Mo.App. 497, 184 S.W.2d 190, 194 (Mo.App.1944) ("The question presented here is not one of creed, doctrine, discipline [sic] or church government, but, on the contrary, calls for the construction of a written instrument (a deed) which involved only the title of property."; "rule of deference" announced in *Hayes v. Manning,* 263 Mo. 1, 172 S.W. 897 (1914), therefore inapplicable). We also note that *Elijah Parish itself* applied the neutral principles approach with respect to property acquired between 1922 and 1937. 682 S.W.2d at 469.

20. Section G–8.0301 provides that, "[w]henever property of, or held for, a particular church of the Presbyterian Church (U.S.A.) ceases to be used by that church as a particular church of the Presbyterian Church (U.S.A.) in according with this Constitution, such property shall be held, used, applied, transferred, or sold as provided by the presbytery."

## II.

In its second Point Relied On, Heartland argues that the trial court erred in dismissing its claim for breach of contract. In its contract claim, Heartland argued that the PCUSA's Book of Order, and the Property–Trust Clause in particular, became part of a contract binding on all PCUSA affiliates, including Gashland.

Heartland's breach of contract claim depends on a contention we have rejected above: that the Book of Order's Property–Trust Clause is binding on Gashland, despite the contrary provisions of Gashland's Articles of Agreement, and the lack of any trust language in the deed conveying the property to Gashland. What we have said above, and particularly in § I.D., disposes of Heartland's second Point.[21]

## Conclusion

The judgment of the circuit court, dismissing Heartland's first amended petition with prejudice for failure to state a claim, is affirmed.

All concur.

---

21. We note that Gashland makes additional arguments, not addressed in § I above, in response to Heartland's contract claim. Thus, Gashland argues that, under our decision in *Executive Board of the Missouri Baptist Convention v. Carnahan*, 170 S.W.3d 437, 448–50 (Mo.App. W.D.2005), it cannot be considered a "member" of the PCUSA bound by its Constitution, because Heartland's amended petition alleges that "[t]he PCUSA is an unincorporated association of Reformed Christian believers"—*i.e.*, individuals. Gashland also argues that its 1987 By–Laws cannot constitute a valid "acceptance" of any contractual "offer" contained in the PCUSA's Book of Order, because there is no indication that the provisions of Gashland's 1987 By–Laws were communicated to the PCUSA or Heartland. Given our disposition we need not address these additional arguments.