# IN THE SUPREME COURT OF TEXAS

══════════
No. 11-0332
══════════

ROBERT MASTERSON, MARK BROWN, GEORGE BUTLER, CHARLES
WESTBROOK, RICHEY OLIVER, CRAIG PORTER, SHARON WEBER, JUNE SMITH,
RITA BAKER, STEPHANIE PEDDY, BILLIE RUTH HODGES, DALLAS CHRISTIAN
AND THE EPISCOPAL CHURCH OF THE GOOD SHEPHERD, PETITIONERS,

v.

THE DIOCESE OF NORTHWEST TEXAS, THE REV. CELIA ELLERY,
DON GRIFFIS AND MICHAEL RYAN, RESPONDENTS

══════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
══════════════════════════════════════════

JUSTICE LEHRMANN, joined by CHIEF JUSTICE JEFFERSON, dissenting.

Today the Court applies state law governing corporations to bar summary judgment for TEC[1] on an ecclesiastical matter over which the Court has no jurisdiction. While I wholeheartedly agree with the Court that church property disputes should be resolved under the neutral-principles approach approved by the Supreme Court in *Jones v. Wolf*, 443 U.S. 595 (1979), in my view, the Court has misapplied those principles in this case. In deciding that the secular law governing corporations controls the outcome of this matter, the Court places undue emphasis on the local church's incorporated status. Although a corporation is a separate entity with authority to amend its

---

[1] Unless otherwise noted, abbreviated terms shall have the meaning specified in the Court's opinion.

bylaws and articles of incorporation, it cannot do so when such an action results in the circumvention of an ecclesiastical decision made by a higher authority within a hierarchical church structure. In this case, the Court determines that Good Shepherd's incorporation allows it to disregard TEC's governing documents by withdrawing from TEC and taking church property with it—actions that go beyond the parish's authority. All the while, Good Shepherd has sought, agreed to, and received the benefits of association with TEC. Because the decision about whether a subordinate church entity can withdraw involves a matter of church polity, which is clearly an ecclesiastical issue, we have no jurisdiction over the subject under the First Amendment of the U.S. Constitution.

Moreover, even if this dispute could be resolved by conducting a purely secular analysis, summary judgment in favor of the Episcopal Leaders remains appropriate. Considering all the relevant statutes and documents, I would hold that a trust on the church property was created in favor of TEC and the Diocese, which became irrevocable upon Good Shepherd's vote to withdraw. Alternatively, I would hold that Good Shepherd was estopped from revoking the trust. Good Shepherd freely and eagerly chose to accept the use and benefit of the property at issue, paying nothing for the privilege. It cannot now unilaterally escape its part of the arrangement. Accordingly, I respectfully dissent.

## I. Background

### A. Good Shepherd Sought the Benefit of TEC Structure

As the Court notes, TEC is structured in three tiers, from the General Convention (at the highest level) to the regional dioceses (at the intermediate level) to the local congregations, divided into parishes, missions, and congregations (at the lower level). *See* ___ S.W.3d at ___. In turn, each

2

subordinate Episcopal affiliate must accede and be subject to the Constitution and Canons of the higher entity or entities. *See id.* Good Shepherd expressed this agreement to be bound by the higher entities repeatedly and consistently until its vote to withdraw in 2006.

When the original members of Good Shepherd first applied to TEC to organize a mission in 1965, the applicants stated that they were "desirous of obtaining the services of the Church, and ready, according to our several abilities, to sustain the same." In accordance with diocesan Canon, the applicants further "promise[d] conformity to [TEC's] Doctrine, Discipline, and Worship" and "to the Constitution and Canons of the General Convention and the Diocese of Northwest Texas." In the 1972 Instrument of Donation declaring the church building and grounds free from debt or lien, Good Shepherd's Vicar and Bishop's Committee further stated "that the building and grounds are secured from the danger of alienation, either in whole or in part, from those who profess and practice the Doctrine, Discipline, and Worship of this Church." Good Shepherd applied for and was granted parish status in 1974, reaffirming in its petition that the signatories thereto were "conscientiously attached to the Doctrine, Discipline and Worship of the Protestant Episcopal Church in the United States of America."

Upon being granted parish status, Good Shepherd incorporated in accordance with diocesan Canon. The Articles of Incorporation provided that "[t]he corporation is organized for religious purposes in order to provide a location for religious worship, education, and the furtherance of the Christian religion." The initial Bylaws, adopted in January 1975, state in Article I:

> The Church of the Good Shepherd is situated in San Angelo, Tom Green County, Texas. It is a constituent part of the Diocese of Northwest Texas and of the Protestant Episcopal Church in the United States of America. The Parish accedes to,

recognizes, and adopts the General Constitution and Canons of that Church, and the Constitution and Canons of the Diocese of Northwest Texas and acknowledges the authority of the same.

Before the underlying dispute arose, Good Shepherd amended its Bylaws twice (once in 1994 and once in 1998), with no material changes made to Article I.

## B. Church Property Placed in Trust

As discussed by the Court, in 1979 TEC amended its Canons, adding Canon I.7.4 (often referred to as the "Dennis Canon") and I.7.5 for the purpose of placing church property in trust:

> **Sec. 4.** All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property *so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitutions and Canons*.
>
> **Sec. 5.** The several Dioceses may, at their election, further confirm the trust declared under the foregoing Section 4 by appropriate action, *but no such action shall be necessary for the existence and validity of the trust*.

(Emphasis added).

In 1982, after TEC enacted the Dennis Canon, the Diocese conveyed the relevant property to Good Shepherd. As the Court notes, the deed itself contained no trust language or other limitation on the conveyance. Finally, in 2006, Good Shepherd's members passed several resolutions by majority vote, with full knowledge of the Dennis Canon to which Good Shepherd had agreed to be bound. Pursuant to these resolutions, Good Shepherd voted to "withdraw[] from, end its membership in, and dissolve[] its union with" TEC and the Diocese. It further voted to amend its

4

Bylaws to remove any reference to TEC, as well as to revoke any trust placed on church property for the benefit of TEC or the Diocese.

## II. Analysis of Neutral-Principles Approach

In *Jones v. Wolf*, the United States Supreme Court recognized as constitutional the neutral-principles approach to resolving church property disputes. 443 U.S. at 602. While courts remain prohibited under this approach "from resolving [such] disputes on the basis of religious doctrine or practice," they may apply "objective, well-established concepts of trust and property law" so long as it involves "no consideration of doctrinal matters." *Id.* at 602–03. This approach, the Supreme Court concluded, "promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id.* at 603. Further,

> the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy.

*Id.* The Supreme Court cautioned, however, that in examining any religious documents to discern the intent of the parties, "a civil court must take care to [do so] in purely secular terms." *Id.* at 604. Thus, if the interpretation of such documents "would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* The Supreme Court stressed that "the outcome of a church property dispute is not foreordained" under a neutral-principles approach. *Id.* at 606. Instead,

> [a]t any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can

5

modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church.* The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.

*Id.* (emphasis added).

Today, this Court adopts the neutral-principles approach for resolution of disputes involving religious organizations. *See* ___ S.W.3d at ___. I fully support this adoption and agree that this approach is the preferable method of resolving such controversies. However, the neutral-principles approach only allows courts to become involved in non-ecclesiastical decisions; it does not confer jurisdiction upon courts to decide matters over which they have no constitutional authority. In my view, the Court oversteps this boundary and ignores its constitutional mandate.

## A. Improper Resolution of Ecclesiastical Issues

In adopting the neutral-principles approach, the Court recognizes that "differences between ecclesiastical and non-ecclesiastical issues will not always be distinct" and that "deferring to decisions of ecclesiastical bodies in matters reserved to them by the First Amendment may, in some instances, effectively determine the property rights in question." *Id.* at ___. Unlike the Court, however, I believe proper deference with respect to such matters determines the property rights at issue in this case. When deciding whether a matter invokes constitutional protection, I believe that we should err on the side of caution, upholding constitutional mandates when in doubt.

The Court divides the questions of Good Shepherd *parish's* authority to withdraw from TEC and Good Shepherd *corporation's* authority to withdraw by amending its bylaws and articles of

6

incorporation. *Id.* at ___. In my view, however, the two inquiries are inextricably linked. The Court goes on to conclude that, because the parish at issue was incorporated and because there was no specific TEC or diocesan restriction on the corporation's authority to amend its bylaws and articles of incorporation, the validity of Good Shepherd's withdrawal by amendment of those documents was *not* an ecclesiastical question. *See id.* I am unconvinced that the incorporated status of the parish removes the issue from the realm of church polity. If Bishop Ohl's determination that the parish could not withdraw from TEC is a binding ecclesiastical decision,[2] it does not cease to be so because of the corporate form taken by the parish. Such a determination permits civil courts to conduct an end-run around the First Amendment's prohibition against inquiry into and resolution of religious issues by effectively allowing the lower church entity's unilateral decision to trump the higher entity's authority over matters of church polity.

Notably, the Court recognizes that "what happens to the relationship between a local congregation that is part of a hierarchical religious organization and the higher organization when members of the local congregation vote to disassociate is an ecclesiastical matter over which civil courts generally do not have jurisdiction." *Id.* at ___ (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–14 (1976)). "But what happens to the property is not," the Court continues, "unless the congregation's affairs have been ordered so that ecclesiastical decisions effectively determine the property issue." *Id.* It follows that Bishop Ohl's determination regarding the parish's authority (or, more accurately, lack of authority) to withdraw from TEC is a binding

---

[2] This determination is unrelated to the undisputed right of the individual members of any religious organization to withdraw their affiliation should they choose to do so.

7

ecclesiastical decision, irrespective of the corporate form taken by the parish. In turn, since Good Shepherd did not validly withdraw from TEC, Good Shepherd remained a constituent thereof and consequently remained subject to TEC's and the Diocese's Constitutions and Canons.

There appears to be no dispute that, as a TEC parish, Good Shepherd could not pick and choose those portions of the governing documents by which it wished to be bound. And the Dennis Cannon and its diocesan counterpart expressly state that the church property is held in trust for TEC and the Diocese. Thus, if Good Shepherd had no authority to withdraw, it had no authority to revoke its adherence to the Canons or to revoke the trust placed on the property by virtue thereof. Moreover, the Canons condition Good Shepherd's authority over the church property on its "remain[ing] a part of, and subject to, this Church and its Constitutions and Canons." By purporting to withdraw from TEC, then, Good Shepherd took the very action that would strip it of its rights in the property. Good Shepherd may not avoid the consequences of its actions—consequences to which it had freely agreed—simply by voting to no longer be subject to those consequences.

## B. Application of Secular Law

### 1. Intent of Parties to Create Trust

Even if this dispute could be resolved in a purely secular manner and without interference with TEC's ecclesiastical determinations, I would still hold that the Episcopal Leaders met their summary judgment burden. The Anglican Leaders argue that no valid trust exists on the property and that, to the extent one did exist, it was revoked upon Good Shepherd's 2006 amendment of its Bylaws. I disagree.

8

Under the Texas Trust Code, "[a] trust is created only if the settlor manifests an intention to create a trust." TEX. PROP. CODE § 112.002. Further, the intent to create a trust must be expressed in writing. *Id.* § 112.004. As discussed above, neither the deed conveying the property at issue to Good Shepherd nor Good Shepherd's Articles of Incorporation and Bylaws reference the creation of a trust. Courts in other states with similar trust statutes have struggled to determine the issue of whether the Dennis Canon, or similarly worded provisions in the governing documents of other hierarchical churches, creates a trust under such circumstances. *See Jones*, 443 U.S. at 606 (endorsing the means utilized by TEC to create a trust by noting that, as an alternative means of ensuring retention of the property by the higher entity, "the constitution of the general church can be made to recite an express trust in favor of the denominational church").

In *Presbytery of Greater Atlanta, Inc. v. Timberridge Presbyterian Church, Inc.* (*Timberridge*), the Georgia Supreme Court held that a local church (Timberridge) affiliated with the hierarchical Presbyterian Church (U.S.A.) (PCUSA) held property in trust for the national church based in part on an explicit trust provision in PCUSA's governing Book of Order, as well as on language in the local church's charter documents. 719 S.E.2d 446 (Ga. 2011). Following a 1982 amendment to the Book of Order by PCUSA's predecessor to add the property trust provision,[3] Timberridge "functioned as a regular member of the national church" until a property dispute arose in 2007, leading to Timberridge's withdrawal from PCUSA. *Id.* at 449–50. In applying the neutral principles doctrine to the dispute, the court aptly noted:

---

[3] The northern and southern branches of the Presbyterian Church formally reunited as PCUSA in 1983, with the Book of Order retaining the trust provision. 719 S.E.2d at 448.

9

> We review all of these materials [deeds, state statutes, and governing documents of the local and national churches], keeping in mind that the outcome of these church property disputes usually turns on the specific facts presented in the record, that the neutral principle factors are interrelated, and that our ultimate goal is to determine "the intentions of the parties" at the local and national level regarding beneficial ownership of the property at issue as expressed "before the dispute erupt[ed]" in a "legally cognizable form."

*Id.* at 450 (quoting *Jones*, 443 U.S. at 603). The court found persuasive that Timberridge's Articles of Incorporation "proclaimed [its] allegiance to the PCUSA Book of Order" containing the trust provision and noted that "at no time during the more than two decades before this dispute erupted and the eight years after it was deeded the property at issue did [Timberridge] even *seek* to amend its Articles to demonstrate any different intent." *Id.* at 455.

By contrast, in *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zionist Church*, the Maryland Court of Appeals held the evidence established that the local incorporated church "did not, in fact, consent to the trust provisions" in the national church's Book of Discipline. 803 A.2d 548, 569 (Md. 2002). Key to the court's holding was the local church's deletion, many years before the property dispute arose, of a requirement in its charter documents to act in accordance with the Book of Discipline. The court also noted the church's addition of a provision in those documents addressing the disposition of church property upon dissolution of the corporation, as well as the absence of trust language in the deed. This omission was significant, the court noted, because the Book of Discipline required such language, but the national church had nevertheless acquiesced in the "deeding irregularity." *Id.*

Like the local church in *Timberridge*, Good Shepherd's corporate documents "proclaimed allegiance" to TEC's and the Diocese's Constitutions and Canons. 719 S.E.2d at 455. The property

10

trust provision was added to the TEC Canons in 1979, before the church property was conveyed to Good Shepherd. Further, like the church in *Timberridge*, and notably in contrast to the church in *From the Heart Church Ministries*, "at no time during the more than two decades before this dispute erupted and the [twenty-four] years after it was deeded the property at issue did [Good Shepherd] even *seek* to amend its [corporate documents] to demonstrate any different intent." *Id.* In fact, Good Shepherd amended its Bylaws twice before the underlying dispute arose, leaving untouched the provision agreeing to be bound by the TEC and Diocesan Canons.[4] Moreover, the absence of trust language from the deed to the property at issue is not a departure from the requirements in the Canons and thus does not, in and of itself, raise suspicion about Good Shepherd's intent to hold the property in trust. *See From the Heart Church Ministries, Inc.*, 803 A.2d at 569.

The Court cites with approval the Missouri Court of Appeals' opinion in *Heartland Presbytery v. Gashland Presbyterian Church*, 364 S.W.3d 575 (Mo. Ct. App. 2012), which further supports the conclusion that a trust was imposed on the church property in this case. In *Heartland Presbytery*, the court held that a local church corporation's Articles of Agreement, which stated that the local church was "connected with and ecclesiastically subject to" PCUSA's predecessor, "[did] not establish its agreement to be bound by the property provisions of the PCUSA's Constitution; instead, it suggests the opposite." *Id.* at 585, 587. Noting that "[t]he 'connected with' language . . . cannot alone establish PCUSA's trust interest," the court went on to examine the statement that the local church "would be '*ecclesiastically* subject to' the denomination." *Id.* at 586. The latter

---

[4] Bishop Ohl also testified by affidavit that Good Shepherd participated in the annual Diocese Conventions each year from 1966 through 2006. This includes 1984, the year the Diocese added the property trust provision to its Canons.

statement, the court concluded, implied that the local church "would *not* be subject to the denomination's authority in *non*-ecclesiastical matters." *Id.* The Articles also provided that title to any property acquired "vests, without qualification, in [the local church] itself, in its corporate capacity," and that such property "can only be conveyed to others pursuant to specific authorization of its members . . . and of its Board of Trustees." *Id.* at 587. These provisions, the court held, lent further credence to the conclusion that the local church did not consent to the PCUSA trust provision. *Id.*

In this case, Good Shepherd's corporate documents contained the kind of language that was conspicuously absent from the Articles of Agreement at issue in *Heartland Presbytery*. Prior to the split with TEC and the Diocese, Good Shepherd's Bylaws stated not only that the church "is a constituent part of the Diocese of Northwest Texas and of the Protestant Episcopal Church in the United States of America," but also that it "accedes to, recognizes, and adopts the General Constitution and Canons of that Church, and the Constitution and Canons of the Diocese of Northwest Texas and acknowledges the authority of the same."[5] This is consistent with Good Shepherd's promise of "conformity to" TEC Doctrine when it originally applied for mission status and the declaration in its parish application that it was "conscientiously attached" to that Doctrine. Thus, unlike in *Heartland Presbytery*, Good Shepherd's corporate documents constitute an "effective

---

[5] The local church's Bylaws in *Heartland Presbytery* did state that PCUSA's Constitution was "obligatory upon it and its members" and that the Bylaws "shall be construed only in conformity" with the Constitution. 364 S.W.3d at 587. However, the court held that these provisions conflicted with the local church's Articles of Agreement and that, under state law, the Articles controlled. *Id.* Here, there is no conflict between Good Shepherd's Articles of Incorporation and its Bylaws; that is, nothing in the Articles of Incorporation is negated, or even affected, by the statement in the Bylaws that Good Shepherd acceded to TEC's and the Diocese's Constitutions and Canons.

12

expression of [Good Shepherd's] intent to be bound by [TEC's and the Diocese's Canons]," which have included the property trust provisions since 1979 and 1984, respectively.[6] *Id.* at 591.

In sum, under a neutral analysis of the relevant documents, I would hold that the Episcopal Leaders met their summary judgment burden with respect to the creation of a trust. In light of the property trust provisions in TEC's and the Diocese's Canons, Good Shepherd's corporate documents agreeing to be bound by those Canons, Good Shepherd's periodic amendment of its corporate documents without altering its allegiance to the Canons, and Good Shepherd's continued participation in Diocesan Conventions prior to the dispute, the Episcopal Leaders conclusively established an expression of intent by Good Shepherd to hold its property in trust for the benefit of TEC and the Diocese.

### 2. The Trust Is Expressly Irrevocable

The Court holds that, regardless of whether Good Shepherd agreed to hold the church property in trust, the trust was revocable under Texas law. ___ S.W.3d at ___. I disagree.

The Court correctly notes that, under Texas law, a trust is revocable unless expressly made irrevocable. TEX. PROP. CODE § 112.051. However, "[n]o specific words of art are required to create an irrevocable trust" so long as the instrument "reflect[s] the trustor's intent to make the trust irrevocable." *Vela v. GRC Land Holdings, Ltd.*, 383 S.W.3d 248, 250–51 (Tex. App.—San Antonio 2012, no pet.) (mem. op.) (citing *McCauley v. Simmer*, 336 S.W.2d 872, 881 (Tex. Civ. App.—Houston 1960, writ dism'd), and *Austin Lake Estates Recreation Club, Inc. v. Gilliam*, 493

---

[6] This is consistent with the Texas Trust Code, which provides for creation of a trust by "a property owner's declaration that the owner holds the property as trustee for another person." TEX. PROP. CODE § 112.001(1).

S.W.2d 343, 347 (Tex. Civ. App.—Austin 1973, writ ref'd n.r.e.)). I would hold that the terms of the property trust provision in the Dennis Canon, to which Good Shepherd agreed to be bound, expressly rendered the trust irrevocable upon Good Shepherd's withdrawal from TEC.

As noted above, the property trust provision in TEC's Canons (with a substantially similar provision in the diocesan Canons) states:

> All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property *so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitutions and Canons*.

(Emphasis added). This provision clearly limits a parish's authority over church property by requiring that the parish be "a part of, and subject to," TEC. Thus, if a parish withdraws from TEC, it necessarily loses such authority to the extent it is inconsistent with holding the property in trust for TEC and the Diocese. While the Dennis Canon does not use the term "irrevocable," it nevertheless reflects Good Shepherd's intent to make the trust irrevocable upon its withdrawal from TEC and was thus sufficient to create an irrevocable trust under Texas law.

The Dennis Canon's language distinguishes the property trust provision here from the national church's trust provision at issue in *From the Heart Church Ministries*, which did not address the situation in which "a local church disaffiliates from the denomination." 803 A.2d at 571. Without such language, the Maryland Court of Appeals declined to find that the trust was irrevocable, concluding that "[c]onsent to holding property in trust during the course of affiliation does not automatically constitute consent to relinquishing that property once the affiliation

14

terminates." *Id.* Here, Good Shepherd did more than consent to holding the property in trust during the course of its affiliation with TEC; it also consented to its authority over the property being contingent on that affiliation. As a result, even if Good Shepherd had the authority to disaffiliate from TEC and the Diocese by proper vote under its Articles and Bylaws, I cannot agree with the Court that Good Shepherd could revoke the trust and maintain control of the property upon its withdrawal. *See Bishop & Diocese of Colo. v. Mote*, 716 P.2d 85, 108 (Colo. 1986) (holding that a local church's articles of incorporation and bylaws that were similar to Good Shepherd's, along with the relevant provisions of TEC's Canons, "foreclose the possibility of the withdrawal of property from the parish simply because a majority of the members of the parish decide to end their association with [TEC]").

The Supreme Court confirmed in *Jones v. Wolf* that "before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property." 443 U.S. at 606. That is exactly what the parties did in this case. Good Shepherd agreed to hold the church property in trust for TEC and the Diocese, and any authority it otherwise had over the property terminated when it withdrew from TEC.

### 3. Good Shepherd Is Estopped from Revoking the Trust

Alternatively, I believe the Episcopal Leaders prevail under the doctrine of quasi-estoppel. The Episcopal Leaders did not formally plead quasi-estoppel as an affirmative defense, though they did allege facts to support it.[7] The summary judgment evidence establishes the applicability of the

---

[7] The Anglican Leaders counterclaimed for a declaratory judgment regarding ownership and possession of the church property. In their First Amended Petition, the Episcopal Leaders argued that they "relied on the promises and statements" of Good Shepherd in "provid[ing] financial support" thereto.

doctrine and precludes Good Shepherd from claiming that it may revoke the trust in conjunction with its withdrawal from TEC. "Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (citation omitted).

Prior to the 2006 dispute, Good Shepherd: had promised conformity to TEC Doctrine and to TEC's and the Diocese's Constitutions and Canons; had accepted grants as well as no-interest and low-interest loans from TEC and the Diocese to assist in building the church; had declared that the church property was "secured from the danger of alienation . . . from those who profess and practice the Doctrine, Discipline, and Worship of this [Episcopal] Church"; and had accepted the conveyance of the property from the Diocese after the property trust provisions were added to TEC's Canons. Having made these promises and accepted these benefits, Good Shepherd may not now contend it is free to disregard these positions because a majority of its members have voted to do so.

### III. Conclusion

In denying summary judgment, the Court oversteps its constitutional bounds to resolve ecclesiastical matters over which it has no authority. Further, the Court ignores language in the relevant documents clarifying that Good Shepherd's authority over the church property is contingent upon its affiliation with TEC and the Diocese. Finally, Good Shepherd is barred from revoking the trust on the property in conjunction with its withdrawal from TEC. For these reasons, I am compelled to respectfully express my dissent.

16

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** August 30, 2013